David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
(818) 990-1299 (phone)
(818) 501-7852 (facsimile)

Michael J. McMorrow (admitted *pro hac vice*)
mjmcmorrow@smithmcmorrow.com
SMITH & MCMORROW P.C.
53 West Jackson Blvd., Suite 1663
Chicago, IL 60604
Tel:  (312) 546-6139
Fax: (888) 664-8172

*Counsel for Plaintiff NEIL SMITH*
*and the putative class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL SMITH, individually and on behalf of a class of similarly situated individuals,<br><br>                   Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>                   Defendant. | Case No. 11-cv-01958-JLS-BGS<br><br>CLASS ACTION<br><br>**PLAINTIFF NEIL SMITH'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. Janis L. Sammartino<br>Hearing Date:  August 15, 2013<br>Time:              1:30 p.m.<br>Place:            Courtroom 3B |

# TABLE OF CONTENTS

I.    THE TCPA .................................................................................................2

II.   BACKGROUND ........................................................................................3

      A.   Text Message Spam ................................................................3

      B.   Microsoft Sent Text Messages to Consumers as Part  of its
           Xbox Mobile Marketing Campaign .......................................4

      C.   Facts Particular to Plaintiff Neil Smith ................................6

III.  THE PROPOSED CLASS .........................................................................7

IV.   ARGUMENT.............................................................................................7

      A.   The Proposed Class Meets Rule 23's Standards for Certification ........8

           1.   The Class of 91,708 Consumers Meets Rule 23's
                Numerosity Requirement and any Ascertainability
                Requirement. ...............................................................9

           2.   Questions of Law and Fact Common to the Class Meet
                Rule 23's Commonality Requirement. ...................10

                i.    Microsoft's Liability Under the TCPA  Presents a
                      Common Question.........................................12

                ii.   Whether an ATDS Was Used to Send the
                      Messages Presents a Common Question. ......................12

                iii.  Whether Microsoft Can Show Prior Express
                      Consent Presents a Common Question..........................15

                iv.   The Injury Suffered by the Class Members
                      Presents a Common Question........................................16

           3.   The Claims of All Class Members are Co-extensive,
                Meeting Rule 23's Typicality Requirement.............................17

           4.   Mr. Smith and Proposed Class Counsel will  Adequately
                Represent the Class. .................................................18

5.      The Proposed Class Also Meets the  Standards of Rule
        23(b)(3). ........................................................................19

        i.      Common Questions of Law and Fact Predominate........20

        ii.     A Class Action is a Superior Method for
                Adjudicating this Controversy.......................................23

B.      The Court Should Appoint Plaintiff's Counsel As Class
        Counsel .........................................................................24

V.   **CONCLUSION** ...........................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Agne v. Papa John's Int'l, Inc.*
   286 F.R.D. 559 (W.D. Wash. 2012) ...................................................8, 11, 17, 24

*Akaosugi v. Benihana Nat. Corp.*
   282 F.R.D. 241 (N.D. Cal. 2012).............................................................7

*Ashmus v. Calderon*
   935 F. Supp. 1048 (N.D. Cal. 1996).....................................................17

*Bateman v. Am. Multi-Cinema, Inc.*
   623 F.3d 708 (9th Cir. 2010) ................................................................8

*Bellows v. NCO Fin. Sys., Inc.*
   No. 3:07–CV–01413–W–AJB, 2008 WL 4155361 (S.D. Cal. Sept. 5, 2008) .....................................................................................................24

*CE Design Ltd. v. Cy's Crabhouse North, Inc.*
   259 F.R.D. 135 (N.D. Ill. 2009)......................................................7, 10

*CE Design v. Beaty Const., Inc.*
   07 C 3340, 2009 WL 192481 (N.D. Ill. Jan. 26, 2009) ......................17

*Celano v. Marriott Int'l Inc.*
   242 F.R.D. 544 (N.D. Cal. 2007).........................................................9

*Cole v. Asurion Corp.*
   267 F.R.D. 322 (C.D. Cal. 2010).......................................................17

*Ellis v. Costco Wholesale Corp.*
   657 F.3d 970 (9th Cir. 2011) ...............................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*
   131 S.Ct. 2179 (2011)........................................................................21

*Espinal v. Burger King Corp.*
   No. 09-20982 (S.D. Fla., 2010) .........................................................19

*General Tel. Co. v. Falcon*
    457 U.S. 147 (1982)...............................................................................17

*G.M. Sign, Inc. v. Finish Thompson, Inc.*
    No. 07 C 5953, 2009 WL 2581324........................................................10

*Grant v. Capital Mgmt. Services, L.P.*
    449 F. App'x 598 (9th Cir. 2011) ...........................................................2

*Heastie v. Cmty. Bank of Greater Peoria*
    125 F.R.D. 669 (N.D. Ill. 1989)..............................................................9

*Hinman v. M and M Rental Ctr., Inc.*
    545 F. Supp. 2d 802 (N.D. Ill. 2008)....................................................16

*Holloway v. Full Spectrum Lending*
    CV 06-5975, 2007 WL 7698843 (C.D. Cal. June 26, 2007)..............................23

*In re Ferrero Litigation*
    278 F.R.D. 552 (S.D. Cal. 2011) ...........................................................20

*In re Jiffy Lube Int'l, Inc. Text Spam Litigation*
    No. 3:11-MD-02261-JM-JMA (S.D. Cal., 2013) ...................................19

*In re Kentucky Grilled Chicken Marketing & Sales Practices Litig.*
    No. 09-cv-07670 (N.D. Ill. 2011) .........................................................19

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*
    268 F.R.D. 652 (S.D. Cal. 2010) ......................................................9, 10

*In re Rubber Chem. Antitrust Litig.*
    232 F.R.D. 346 (N.D. Cal. 2005)............................................................9

*Kavu, Inc. v. Omnipak Corp.*
    246 F.R.D. 642 (W.D. Wash. 2007) .................................9, 17, 20, 24

*Kramer v. Autobytel, Inc.*
    759 F. Supp. 2d 1165 (N.D. Cal. 2010)...................................................2

*Lee v. Stonebridge Life Ins. Co. et al.*
    No. 11-cv-00043-RS (N.D. Cal. 2013).................................................19

*Lee v. Stonebridge Life Ins. Co.*
    -- F.R.D. ---, No. C 11-0043 RS, 2013 WL 542854 (N.D. Cal. Feb. 12,
    2013) ...........................................................................................8, 11, 23

*Lozano v. Twentieth Century Fox*
    No. 09-cv-06344 (N.D. Ill., 2011) ......................................................19

*Mazza v. Am. Honda Motor Co., Inc.*
    666 F.3d 581 (9th Cir. 2012) ...............................................................20

*Mims v. Arrow Fin. Servs. LLC*
    132 S. Ct. 740 (2012)......................................................................2, 16

*Moeller v. Taco Bell Corp.*
    C 02-5849 MJJ, 2004 WL 5669683 (N.D. Cal. Dec. 7, 2004)............7

*Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*
    08 C 5959, 2010 WL 4931001 (N.D. Ill. Nov. 29, 2010) ..................20

*Parra v. Bashas', Inc.*
    536 F.3d 975 (9th Cir. 2008) ..........................................................10, 11

*Pierce v. County of Orange*
    526 F.3d 1190 (9th Cir. 2008) .............................................................20

*Satterfield v. Simon & Schuster, Inc.*
    569 F.3d 946 (9th Cir. 2009) .........................................2, 3, 13, 15

*Sengenberger v. Credit Control Services, Inc.*
    No. 09-C-2796, 2010 WL 1791270 (N.D. Ill. May 5, 2010) ..............2

*Silbaugh v. Viking Magazine Servs.*
    278 F.R.D. 389 (N.D. Ohio 2012) ...............................11, 15, 16, 21

*United Steel v. ConocoPhillips Co.*
    593 F.3d 802 (9th Cir. 2010) ...............................................................20

*Wal-Mart Stores, Inc. v. Dukes*
    131 S.Ct. 2541 (2011)...................................................................8, 11, 16

*Wolin v. Jaguar Land Rover N. Am., LLC*
    617 F.3d 1168 (9th Cir. 2010) ......................................................20, 23

*Wyatt v. Creditcare, Inc.*
04-03681-JF, 2005 WL 2780684 (N.D. Cal. Oct. 25, 2005)............................18

*Zeisel v. Diamond Foods, Inc.*
C 10-01192 JSW, 2011 WL 2221113 (N.D. Cal. June 7, 2011) ......................17

*Zinser v. Accufix Research Inst., Inc.*
253 F.3d 1180 (9th Cir. 2001) ...................................................................20

**FEDERAL STATUTES**

TCPA.................................................................................................passim

47 U.S.C. § 227(a)(1)...............................................................................13

47 U.S.C. § 227(b)(1)(A)(iii).................................................................2, 21

47 U.S.C. § 227(b)(3)(A-C).....................................................................3, 16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ..................................................................................passim

Fed. R. Civ. P. 23(a)...........................................................................8, 18, 19

Fed. R. Civ. P. 23(a)(1)..............................................................................9

Fed. R. Civ. P. 23(a)(2)............................................................................10

Fed. R. Civ. P. 23(a)(3)............................................................................17

Fed. R. Civ. P. 23(a)(4)............................................................................18

Fed. R. Civ. P. 23(b)...............................................................................20

Fed. R. Civ. P. 23(b)(3)......................................................................passim

Fed. R. Civ. P. 23(c)(1)(C) ........................................................................7

Fed. R. Civ. P. 23(g)................................................................................25

Fed. R. Civ. P. 23(g)(1)(A)(i-iv)................................................................25

Fed. R. Civ. P. 23(g)(1)(B) .......................................................................24

Nicole Perlroth, *Spam Invades a Last Refuge, the Cellphone*, N.Y. Times
April 7, 2012 ....................................................................................3

Pew Research Center: *Mobile Phone Problems* .......................................3

FCC Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18
FCC Rcd. 14014 (2003).....................................................................13

On September 12, 2008, Defendant Microsoft Corporation ("Microsoft") and its advertising agents blasted text message advertisements for its new Xbox Mobile gaming platform to the wireless phones of Plaintiff Neil Smith and 91,707 other consumers through a single abbreviated phone number known as a "short code." Microsoft did not know who these consumers were; it merely used a list purchased from a mobile marketing company. None of the consumers gave Microsoft consent to send them text message advertisements. In response, Mr. Smith sued Microsoft for violating the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and now seeks to certify a class of consumers who were sent the Xbox text messages through short code 88202 on September 12, 2008.

Analyzing class certification will be simpler here than most cases, because all Class members' claims are identical, deriving from a single act by Microsoft and its advertising agents—the sending of the September 12, 2008 text message blast. Simplifying matters further is the fact that the entire class can be identified through a single record produced in discovery—a list produced by wireless aggregator m-Qube, Inc. (the "m-Qube List") containing a record of every wireless number contacted by Microsoft through short code 88202, and the content of the message sent to that number. Finally, Microsoft admits it did not obtain consent directly from any of the consumers whose numbers appear in the m-Qube List, and it has not, and cannot, present any evidence that it obtained consent through others.

There are only three questions to resolve in a TCPA case such as this one: (1) did the defendant send, or have sent, a message; (2) did it use an automatic telephone dialing system; and (3) did it receive prior express consent from the called party. These can all be answered without individual inquiry, making class certification amply appropriate here. Accordingly, Plaintiff respectfully moves this Court for an Order certifying this case as a class action pursuant to Rule 23(b)(3).

## I.    THE TCPA

Congress enacted the TCPA in order to prevent "intrusive nuisance calls" to consumer's telephones that are "invasive of privacy." *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012)[1]; *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).  The TCPA prohibits parties from making:

> any call (other than a call made for emergency purposes or *made with the prior express consent of the called party*) using any automatic telephone dialing system . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added); *see also Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1170 (N.D. Cal. 2010).  It "is clearly the law in the Ninth Circuit" that the TCPA applies with equal force to the transmission of text messages. *Kramer,* 759 F. Supp. 2d at 1170.   As this Court recently confirmed, a plaintiff need not suffer economic injury to state a claim under the TCPA— Congress enacted the TCPA to prevent invasions of privacy caused by unsolicited telemarketing calls.  (*See* Order Denying Mtn. to Dismiss, Dkt. 15, at 8-9.)

Whether Mr. Smith and the members of the proposed Class provided their prior express consent to receive the messages at issue is an affirmative defense to a TCPA claim.  *Grant v. Capital Mgmt. Services, L.P.,* 449 F. App'x 598, 600, n.1 (9th Cir. 2011).   As an affirmative defense, both the Federal Communications Commission and the courts have recognized that the burden is on the defendant to demonstrate prior express consent.  *Sengenberger v. Credit Control Services, Inc.,* No. 09-C-2796, 2010 WL 1791270, at *4 (N.D. Ill. May 5, 2010).  "Prior express consent" has been defined by the Ninth Circuit as consent that is "clearly and

---

[1]    The Supreme Court discusses Congress' TCPA findings, including consumers' outrage "over the proliferation of intrusive, nuisance [telemarketing] calls to their homes" and that "automated or prerecorded telephone calls made to private residences [] were rightly regarded by recipients as an invasion of privacy." *Mims*, 123 S.Ct at 745 (internal quotations and citations omitted).

unmistakably stated." *Satterfield*, 569 F.3d at 955. The TCPA sets statutory damages in the amount of $500 per violation, with an allowance for trebling, as well as injunctive relief. *See* 47 U.S.C. § 227(b)(3)(A-C).

## II.    BACKGROUND

### A.    Text Message Spam

Text message spam is a prevalent and growing problem; 69% of Americans have received text spam on their cellular telephones.[2] These spam text messages have increased dramatically in volume in recent years, because the ability to transmit bulk communications to thousands of individuals cheaply is attractive to advertisers.[3] This lawsuit and Motion are products of this emerging landscape.

The process by which spam text messages are created and sent is well-established. An advertiser develops a message that it wants to deliver to consumers by text message, and then delivers the "copy" – the 160 character (or shorter) message – to a text message marketing company that can transmit the message to a list of recipients. In some cases, the advertiser itself provides the recipient phone numbers, while in others, the advertiser or one of its advertising agents purchases a list of recipient numbers. Once the message copy and numbers are together, that information is sent to a company that can transmit the messages; it uploads the numbers, message copy and any other instructions into a computer program, which transmits the messages to the networks of the wireless carriers.

Transmitting a text message blast is more complex than simply dialing a phone. The companies that transmit text messages in volume are known as Value

---

[2] Pew Research Center: *Mobile Phone Problems*, August 2, 2012, *available at* http://www.pewinternet.org/Reports/2012/Mobile-phone-problems/Main-findings/Mobile-phone-problems.aspx.

[3] According to a recent New York Times article, consumers in the United States received approximately 4.5 *billion* spam text messages in 2011. *See* Nicole Perlroth, *Spam Invades a Last Refuge, the Cellphone*, N.Y. Times April 7, 2012.

Added Service Providers ("VASPs"). (*See* Declaration of Randall Snyder ("Snyder Decl."), attached hereto, ¶¶ 10-11.) VASPs use a "short code" – an abbreviated 5- or 6-digit telephone number – as the originating address for text messages sent to mobile subscribers. Individual short codes are either leased by a VASP on behalf of the companies for which a mobile text messaging application program is being run or they can be leased by the branded companies themselves and provided to the VASP. (*Id.*, ¶¶ 13-14.) VASPs employ equipment that has the ability to send any number of commercial text messages *en masse* to cellular telephone subscribers as well as receive individual text messages from those subscribers. (*Id.*, ¶ 12.) VASPs connect to the cellular carrier networks using internet-based connections and communications protocols. (*Id.*, ¶ 13.)

Many VASPs do not connect directly to the wireless carriers' networks; instead, VASPs connect indirectly to those networks through intermediaries known as SMS aggregators. (*Id.*, ¶ 15.) These SMS aggregators are in the business of connecting to multiple wireless carrier networks and reselling that connectivity to VASPs. (*Id.*) Aggregation of multiple wireless carrier network connections into a single connection to a VASP is highly advantageous to the VASP—it allows the VASP to provide SMS-based applications to subscribers quickly and easily, and also allows the VASP to make applications available to all mobile subscribers in the U.S. at once, regardless of which wireless carrier serves them. (*Id.*, ¶ 16.)

**B.    Microsoft Sent Text Messages to Consumers as Part of its Xbox Mobile Marketing Campaign**

In the summer of 2008, Microsoft and two of its ad agencies, Wunderman and Iconmobile, developed a mobile advertising campaign for Microsoft's new Xbox mobile gaming website. The purpose was to "increase awareness, increase customer engagement and drive traffic to Xbox.mobi." (*See* Declaration of Evan M. Meyers ("Meyers Decl."), attached hereto, ¶ 3, Ex. 1.) The campaign included

several elements, including "SMS advertising" to "get users to the Xbox.mobi site and receive downloadable content." (*Id*.) Microsoft admitted these facts in a filing with this Court. (*See* Joint Case Mgmt. Conf. Stmt., Dkt. 25, at 3-4.)

In order to track the success of its text message advertisements, Microsoft created two "tracking URL's" which would be embedded in the text messages, http://xbox.mobi/sm1 and http://xbox.mobi/sm2. (Meyers Decl., ¶ 4, Ex. 2.) Microsoft and its ad agencies created two slightly different versions of the text message, with one focusing on free content and the other focusing on updates. (*Id*.) The tracking URL's were then added so that, when clicked by a recipient, Microsoft could determine which of the two versions of the text message triggered the response. (*Id*., at ¶ 5, Ex. 3; *Id*., at ¶ 6, Ex. 4.) Iconmobile engaged Come & Stay, Inc. ("Come & Stay"), a text message advertising company, to deliver the messages, and on September 8, 2008, Eric Wingren, an Iconmobile employee, forwarded to Michael Richmond, a Come & Stay employee, the "copy for the two variations of Xbox SMS ads – one message focus on 'downloads' and the other on 'updates' – to be sent to 50% of the sample each." (*Id*., at ¶ 6, Ex. 4.) Wingren wanted the messages "to go out this Fri Sep 12." (*Id*.)

On September 12, 2008, Come & Stay sent the messages. Although Come & Stay has produced no records of the transmissions, other evidence demonstrates that Come & Stay had the text messages delivered. SMS aggregator[4] m-Qube delivered 92,927 Xbox text messages to 91,708 unique phone numbers, including Plaintiff's. (Snyder Decl., ¶ 24; Meyers Decl., ¶ 7, Ex. 5 (Ex. 5 is the entire m-Qube List)). The short code used to transmit the messages was 88202. (*Id*.) Short

---

[4] As described above, an SMS aggregator controls access to the networks of the wireless carriers. SMS aggregators allow companies such as Microsoft and Come & Stay to access the wireless carriers networks (which they cannot access directly) to deliver their content to wireless subscribers. (Snyder Decl.¶¶ 15-16.)

code 88202 was, on September 12, 2008, licensed to TellMyCell, Inc. ("TellMyCell"), a "mobile content delivery provider" whose business included sending text messages on behalf of its clients. (Snyder Decl., ¶¶ 18-19, 22; Meyers Decl., ¶ 8, Ex. 6.) One of TellMyCell's clients was Come & Stay. (Meyers Decl., ¶ 8, Ex. 7.) Even without direct evidence from Come & Stay, the m-Qube List establishes that TellMyCell transmitted to m-Qube the X-box-related messages that Come & Stay contracted to send, and m-Qube delivered those messages to the wireless carriers' networks (and to the Class). (Snyder Decl., ¶¶ 22-24; Meyers Decl., ¶ 7, Ex. 5.)

### C. Facts Particular to Plaintiff Neil Smith

On September 12, 2008, Plaintiff Neil Smith received a text message on his cellular telephone from short code 88202. (*See* Declaration of Neil Smith ("Smith Decl."), attached hereto, ¶ 3, Ex. 1; Meyers Decl., ¶ 7, Ex. 5.) The body of the text message received by Mr. Smith read:

> FREE Xbox games content! http://xbox.mobi/sm1
> Personalize your phone:- Ringtones- Wallpaper- Trailers-
> Game updates To opt out reply end

(Compl., ¶17; Smith Decl., ¶ 3, Ex. 1; Meyers Decl., ¶ 7, Ex. 5; Snyder Decl., ¶ 21.) Mr. Smith did not request the text message, nor did he consent in any way to receive it. (Smith Decl., ¶¶ 4-5.) The text message Mr. Smith received was just one of the messages transmitted *en masse* to 91,708 unique phone numbers in a single blast from short code 88202 on September 12, 2008. (Snyder Decl., ¶¶ 23-24; Meyers Decl., ¶ 7, Ex. 5.) All of the text messages transmitted from short code 88202 were sent in an automated fashion using the same mechanisms. (Snyder Decl., ¶¶ 25-29.) The text message received by Plaintiff Smith contained the same or substantially similar content as those received by the remaining members of the proposed class—all messages sent to the 91,708 putative Class members were sent

on the same date, from the same short code, and they all advertised Microsoft's Xbox product.  (Snyder Decl., ¶ 23-24; Meyers Decl., ¶ 7, Ex. 5.)

## III.    THE PROPOSED CLASS

Plaintiff seeks to certify this case as a class action on behalf of a Class defined as follows:  All individuals that received a text message from short code 88202 containing the term "Xbox" on September 12 or September 13, 2008.[5] According to records produced in this case by the aggregator m-Qube, the proposed Class consists of 91,708 individuals, including Plaintiff Neil Smith. (Snyder Decl., ¶ 24; Meyers Decl., ¶ 7, Ex. 5.)[6]

## IV.    ARGUMENT

This case presents a straightforward class certification analysis, as the claims of all Class members are identical and derive from a single action by Microsoft: the transmission of a blast of 92,927 text messages to 91,708 different cellular phone numbers – sent on the same day, from the same short code, and advertising the same product – to consumers who did not consent to receive them.  Because Microsoft's conduct consisted of a single act uniformly impacting all members of

---

[5] The extra day accounts for any Class members who may not have received the message until September 13, due to technical issues, time zone changes, etc.

[6] This class definition has been modified from that pled in the Complaint (*see* Compl. ¶ 21), as the evidence collected in this case supports a different class definition than that originally pled.  Altering the class definition as a result of discovery is contemplated by Fed. R. Civ. P. 23(c)(1)(C) (stating that an order certifying a class "may be altered or amended before final judgment"); *see also Moeller v. Taco Bell Corp.*, C 02-5849 MJJ, 2004 WL 5669683, at *1 (N.D. Cal. Dec. 7, 2004); *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 140 (N.D. Ill. 2009) (limiting *sua sponte* plaintiff's broad class definition in TCPA fax case to numbers listed on logs for particular dates).  If the Court requires, Plaintiff will seek leave to amend the Complaint to conform the class definition.  *See Akaosugi v. Benihana Nat. Corp.*, 282 F.R.D. 241, 253 (N.D. Cal. 2012) (providing plaintiff leave to file amended complaint after class certification ruling).

the Class, all of the questions raised in this case are common ones, making class certification eminently appropriate.

Courts have not hesitated to certify TCPA classes involving the transmission of text message spam. In *Lee v. Stonebridge Life Ins. Co.*, -- F.R.D. ---, No. C 11-0043 RS, 2013 WL 542854 (N.D. Cal. Feb. 12, 2013), the Northern District of California recently certified a class of consumers who received unsolicited text messages from the defendants, an insurance company and its third-party marketing agent. And in *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012), the Western District of Washington also recently certified a class of 68,000 consumers to whom the defendant and its franchisees sent unsolicited text messages. This Court should likewise certify the Class proposed above.

**A.    The Proposed Class Meets Rule 23's Standards for Certification**

A class action may be maintained under Rule 23 "if two conditions are met—the suit must satisfy the criteria set forth in subdivision (a) (*i.e.* numerosity, commonality, typicality, and adequacy of representation), and it must also fit into one of the three categories described in subdivision (b)." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (quoting *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010)). Plaintiff here seeks certification under Rule 23(b)(3), which requires that common questions of law or fact predominate and that maintaining the suit as a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). The merits of the underlying claim are largely immaterial to a class certification motion; a court only considers the merits of the claim insofar as they overlap with Rule 23's certification requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-52 (2011); *see also Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 981 (9th Cir. 2011).

The proposed Class satisfies each of Rule 23(a)'s prerequisites and the

requirements for certification under Rules 23(b)(3). The Class should be certified.

### 1. The Class of 91,708 Consumers Meets Rule 23's Numerosity Requirement and any Ascertainability Requirement.

The Class in this case consists of 91,708 consumers who received a text message advertising Microsoft's Xbox from short code 88202 on September 12 or 13, 2008. This Class easily meets Rule 23's numerosity requirement, and is likewise easily ascertainable.

The numerosity requirement is met when "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). To satisfy this requirement, a plaintiff need not demonstrate the exact number of class members, nor is there a particular "magic number" that is required. *See In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350-51 (N.D. Cal. 2005) ("Plaintiffs do not need to state the exact number of potential class members, nor is a specific number of class members required for numerosity.") Generally, numerosity is satisfied when the class comprises 40 or more members, *Celano v. Marriott Int'l Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007), and classes that number in the thousands "clearly" satisfy the numerosity requirement. *See e.g., Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 674 (N.D. Ill. 1989); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 646-47 (W.D. Wash. 2007) (finding numerosity satisfied in TCPA case involving the transmission of 3,000 unsolicited faxes). The text messages in this case were transmitted to 91,708 class members on or about September 12, 2008. (Snyder Decl., ¶ 24; Meyers Decl., ¶ 7, Ex. 5). A class of 91,708 amply satisfies the numerosity requirement. *See In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 660-61 (S.D. Cal. 2010) (finding that joinder of groups of 16,000 and 2,500 claims would each be impractical).

In addition, the class in this case is easily ascertainable. Although not a formal requirement of Rule 23, many courts, including this Court, require that the

class definition identify "a distinct group of plaintiffs whose members [can] be identified with particularity." *In re Nat'l W. Life*, 268 F.R.D. at 659 (citing *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978)). The class definition must supply "objective criteria" by which membership may be "presently ascertain[ed]," such as "a defendant's own actions and the damages caused by such actions." *In re Nat'l W. Life*, 268 F.R.D. at 659. As long as "the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist" because the primary goal "is to make it 'administratively feasible' for the court to determine individual class membership." *In re Nat'l W. Life*, 268 F.R.D. at 659 (collecting authorities).

The m-Qube List identifies the unique cellular telephone numbers of the Class Plaintiff seeks to certify—all individuals who received a text message from short code 88202 containing the term "Xbox" on September 12 or September 13, 2008. The Class can be easily identified with particularity through this evidence. *See G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, *4 (finding TCPA class identifiable because "[plaintiff] may use the log and fax numbers to 'work backwards' to locate and identify the exact entities to whom the fax was sent."); *Cy's Crabhouse North, Inc.* 259 F.R.D at 141 (finding class sufficiently identifiable in a TCPA fax case through reference to fax numbers on transmission logs). Because the m-Qube List will allow the parties to "determine who is and who is not in the classes based on [the] records," the class definition "adequately describe[s] the proposed class[]." *In re Nat'l W. Life*, 268 F.R.D. 660.

### 2. *Questions of Law and Fact Common to the Class Meet Rule 23's Commonality Requirement.*

The second threshold to certification requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This rule is "construed permissively." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008).

Commonality may be demonstrated when the claims of all class members "depend upon a common contention" and "even a single common question will do." *Dukes*, 131 S.Ct. at 2545, 2556; *see also Parra*, 536 F.3d at 978 ("[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.") The common contention must be such that it is capable of class-wide resolution, and the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2545. Where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parra*, 536 F.3d at 978-79. This case is limited to one count alleging violation of the TCPA, and the violation is the same for each proposed Class member—text message transmissions about the same product from the same short code using the same technology on the same day. Further, all of the messages were transmitted with Microsoft's knowledge and in furtherance of its marketing program.

Other courts that have considered class certification in TCPA text messages cases have concluded that a class such as the proposed Class here meets the commonality standard. Because the Plaintiff's "allegation is not merely that all class members suffered a violation of the TCPA, but rather that all class members were sent substantially similar unsolicited text messages by the same defendants, using the same automatic dialing technology, commonality is satisfied." *Agne*, 286 F.R.D. at 567; *see Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389, 393 (N.D. Ohio 2012) ("plaintiff asserts that defendant set up a single text message marketing campaign that ran for a one month period which was conducted in the same manner with respect to all of the class members"); *Stonebridge*, -- F.R.D. ---, 2013 WL 542854, at *3 (noting that the defendant in a text message TCPA case "pointed

to no question of law or fact that is not suitable for disposition on a class-wide basis.")  The same conclusion is warranted here.

### i.   Microsoft's Liability Under the TCPA Presents a Common Question.

The primary question in this class action, whether Microsoft is liable under the TCPA for the transmission of the text messages from short code 88202 to the proposed Class, is a common one that the evidence adduced to date shows can be answered on a class-wide basis.  The evidence in the record, including marketing plan proposals, purchase orders, and the m-Qube List, demonstrates a uniform purpose and goal for the transmission of the text messages.  All of the messages were transmitted from a single short code in a single day.  All of the messages contained similar content advertising the same product—there were two versions of the text message, and each of the two versions of the message was sent to roughly half of the numbers on the m-Qube List.  Because the text messages transmitted were all uniform – in content, in the short code used, in the date sent, and in the equipment used to transmit the messages – Defendant's liability for transmitting those text messages will also be a question easily resolved "in one stroke" on a class-wide basis.  In other words, Defendant is either liable for a TCPA violation for all 91,708 Class members, or it is not liable at all.  Either way, the answer is the same for all putative Class members, thus readily satisfying the commonality requirement of Rule 23.

### ii.   Whether an ATDS Was Used to Send the Messages Presents a Common Question.

The use of an ATDS to send the text messages presents another common question.  Here, the "content" or "call to action" in each text message was the same—an advertisement for Xbox content on the consumer's phone, combined with a nearly identical hyperlink to a website for Microsoft's Xbox gaming system.

The two versions of the message stated:

> FREE Xbox games content! http://xbox.mobi/sm1
> Personalize your phone:- Ringtones- Wallpaper- Trailers-
> Game updatesTo opt out reply end

> Xbox updates on the go. http://xbox.mobi/sm2 The latest
> on your phone!- Free ringtones- Trailers- Game updates-
> Events- GamerCard accessoptout X

(Meyers Decl., ¶ 6, Ex. 4; *Id*., ¶ 7, Ex. 5.)   The text message received by Plaintiff included the first of these versions and contained such a hyperlink.  (Compl., ¶17; Smith Decl., ¶ 3; Meyers Decl., ¶ 7, Ex. 5; Snyder Decl., ¶ 21.)  Microsoft admits that it owns and operates the site http://xbox.mobi.   (Answer, Dkt. 16, ¶18.) Microsoft created the two "tracking URL's" http://xbox.mobi/sm1 and http://xbox.mobi/sm2 specifically to be inserted in these text messages.  (Meyers Decl., ¶ 4, Ex. 2.)  All of the text messages were transmitted using TellMyCell's equipment, sent through m-Qube's SMS portal, using the same short code, in the same short time frame, and containing one of the two messages above.  (Snyder Decl., ¶¶ 23-24, 28; Meyers Decl., ¶ 7, Ex. 5.)  Because the text messages were all sent using the same technology on the same day, the question of whether an ATDS was used in sending the text messages is a common one.  (Snyder Decl., ¶ 28.)

Congress defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."   47 U.S.C. § 227(a)(1); *Satterfield*, 569 F.3d at 950-51.  The FCC has further explained that an ATDS includes equipment that has the capacity to dial telephone numbers from a provided database or electronic list of numbers.  *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014 at 14091, ¶131. (2003).  The m-Qube List itself, along with the expert opinion of Randall Snyder, demonstrates

that this question is capable of class-wide determination, as the messages were all transmitted from the same short code using the same equipment. (Snyder Decl., ¶¶ 25-26, 28-29.) All 92,927 text messages were transmitted to from a single short code over the course of a single day. (Snyder Decl., ¶¶ 23-24; Meyers Decl., ¶ 7, Ex. 5.) This rapid deployment indicates the use of a single technology in the transmission of these messages (as opposed to different transmission methods for each phone number). (Snyder Decl., ¶¶ 25-26, 28-29.) Further, the same equipment had to have been used to transmit text messages in this manner. (*Id*.) Because a single technology and the same equipment were used to transmit these messages, the question of whether an ATDS was used is a common one to all class members. (Snyder Decl., ¶ 28.)

The m-Qube List itself shows not only that a single technology was used to transmit the messages, but also that the technology was in fact an ATDS. (Snyder Decl., ¶¶ 25-29.) The text messages here were transmitted in a blast fashion, *i.e.*, the content and the recipient telephone numbers were transmitted at a rate of more than one message per second. (Snyder Decl., ¶ 25; Meyers Decl., ¶ 6, Ex. 5.) The large quantity of numbers transmitted over such a short time period demonstrates that the equipment used had the capacity to store, or produce and dial, numbers in a random or sequential fashion or from an electronic list of numbers, as well as the capacity to dial such numbers. (Snyder Decl., ¶¶ 25-29.) More importantly, however, the evidence demonstrates that the question of whether an ATDS was used is a common one—all of the messages were sent as part of a single batch, using the same technology, the same short code, and the same SMS gateway. Even if the Court were to determine that TellMyCell's equipment and systems did not constitute an ATDS, it would make that determination on behalf of the entire Class in one ruling, making the answer common to all members of the Class.

### iii. Whether Microsoft Can Show Prior Express Consent Presents a Common Question.

A third common question is whether Defendant obtained express consent from the Plaintiff or proposed Class prior to sending the text messages. Defendant has raised consent as an affirmative defense in its Answer (*see* Answer, Dkt. 16, at 4), but Defendant has neither gathered nor produced <u>any</u> evidence to demonstrate that it obtained consent from Plaintiff or any Class member, including where, when or how it obtained such consent, or what consent language was actually used. In fact, Defendant's Interrogatory responses demonstrate that Defendant did not obtain direct consent from any Class members. Instead, defendant relied upon a "database" from Come & Stay of "subscribers opted in for a variety of things, such as ringtones, content downloads, and executable files." (Meyers Decl., ¶ 9, Ex. 7 (Response to Interrogatory No. 5.)) Defendant offers nothing to suggest that any of these "subscribers" consented to receive text messages or other ads on their wireless phones, much less the "clear and unmistakable" consent required by the TCPA. *Satterfield*, 569 F.3d at 955. There is also no evidence that Microsoft ever saw the database, much less obtained consent from the consumers in that database for Microsoft to send text message advertisements to them. Despite twenty months to look, Microsoft has produced no evidence of any "opt in" language constituting consent to receive text messages, nor has it produced any evidence of where such consent was given, how it was given, when it was given, or to whom it was given.

Plaintiff certainly never gave consent to Microsoft to send him text messages or otherwise contact him by cellular phone. (Smith Decl., ¶¶ 4-5.) The absence of evidence of consent as to Plaintiff or any of the Class members whose wireless numbers appear on the m-Qube List demonstrates that the question of consent is a common one. *See Silbaugh*, 28 F.R.D. at 393 ("Having produced no evidence that any individual consented to receive the text messages . . . defendant is unable to

realistically argue that individual issues regarding consent outweigh the commonality.")

iv.   The Injury Suffered by the Class Members Presents a Common Question.

Another common question is whether Plaintiff and the Class members all suffered the same injury entitling them to damages. *See, e.g., Dukes*, 131 S.Ct. at 2551. Each Class member here suffered the same invasion of privacy, and is entitled to the same damages. The TCPA's private right of action exists to redress privacy violations caused by the transmission of unsolicited text messages, which are annoying and invasive of privacy. *Mims*, 123 S.Ct. at 745; *see also* July 20, 2012 Order, Dkt. 15, at 8-9 (explaining that the TCPA protects privacy rights, and does not depend on economic injury); *Silbaugh*, 278 F.R.D. at 393 ("every court examining the pertinent language of the TCPA has concluded that a plaintiff does not have to prove that he was charged for a call to state a claim under the TCPA.") Further, the TCPA provides for statutory injunctive relief and damages of $500 per violation, with the possibility of trebling those damages if a defendant's conduct was willful. 47 U.S.C. § 227(b)(3)(A-C). Each Class member suffered the same injury; the question as to damages is, thus, a common question.

Other Courts have noted that in TCPA cases such as this, when thousands of calls are made as part of an "organized program," and when defendants engaged in a "standardized course of conduct," the commonality requirement is satisfied. *See Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806-07 (N.D. Ill. 2008) (collecting authorities). This is precisely the case here, where thousands of text messages were transmitted from a single short code, on the same day, using the same technology, and resulting in identical injury to the Class's privacy rights. The answer to each question can be determined based on common information and data, applicable to the Class as a whole and largely based on the Defendant's own

conduct, which is identical towards each Class member. Commonality is satisfied.

### 3. The Claims of All Class Members are Co-extensive, Meeting Rule 23's Typicality Requirement.

Rule 23 next requires that class representatives have claims that are typical of those of the putative class members. Fed. R. Civ. P. 23(a)(3). The typicality requirement is closely related to the commonality requirement and is satisfied if Plaintiff's claims arise from the same practice or course of conduct that gives rise to the claims of other Class members. *Cole v. Asurion Corp.*, 267 F.R.D. 322, 326 (C.D. Cal. 2010). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Zeisel v. Diamond Foods, Inc.,* C 10-01192 JSW, 2011 WL 2221113 at *7 (N.D. Cal. June 7, 2011) (citing *Hanlon v. Chrystler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Typicality means the named plaintiff's claims must be "reasonably coextensive" with absent class members' claims. *Zeisel*, 2011 WL 2221113, at *7. Typicality has been found where a defendant's practice of sending unsolicited advertisements to the named plaintiff and the proposed class resulted in the claims of the potential plaintiffs being "based upon the same legal theory, *i.e.* violation of the TCPA." *CE Design v. Beaty Const., Inc.*, 07 C 3340, 2009 WL 192481, *5 (N.D. Ill. Jan. 26, 2009); *see also Kavu, Inc.*, 246 F.R.D. at 648 (finding named plaintiff's TCPA claim for receiving unsolicited faxes typical of the class). Finally, "a finding of commonality will ordinarily support a finding of typicality." *Ashmus v. Calderon*, 935 F. Supp. 1048 (N.D. Cal. 1996); *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (noting how commonality and typicality requirements "merge.") Courts have found typicality in TCPA text message claims where "all class members' claims, arise from text marketing campaigns." *Agne*, 286 F.R.D. at 569.

Here, Plaintiff Smith has a claim that is coextensive with the claims of the proposed Class members. Smith and the Class members all received one of two versions of a text message sent by Microsoft on September 12, 2008, and Smith and the Class members all received the text message from short code 88202, sent through the aggregator m-Qube. All of the messages were sent to advertise the mobile capabilities of Xbox. As recognized by Congress when it passed the TCPA, these spam text message calls violated the privacy rights of Plaintiff and the other Class members. Thus, Plaintiff's claim under the TCPA arises out of the same course of conduct, is based on the same legal theory, and resulted in the same injury as the proposed Class's claims. The typicality requirement is satisfied.

### 4. Mr. Smith and Proposed Class Counsel will Adequately Represent the Class.

The final Rule 23(a) prerequisite requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor has two components. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Wyatt v. Creditcare, Inc.,* 04-03681-JF, 2005 WL 2780684 at *5 (N.D. Cal. Oct. 25, 2005) (quoting *Lerwill*, 582 F.2d at 512).

Plaintiff Smith is a member of the Class he seeks to represent. The evidence in this case demonstrates that he received the text message described in Paragraph 17 of the Complaint. Mr. Smith's cellular phone number appears on the m-Qube List along with the content of the text message he received, which is the same message described in the Complaint. (Smith Decl., ¶ 3; Meyers Decl., ¶ 7, Ex. 5; Snyder Decl., ¶ 21.) Mr. Smith's wireless phone bill from AT&T shows his receipt of an inbound text message from short code 88202 on September 12, 2008,

the same date as the messages were sent.  (Smith Decl., ¶ 3.)

Mr. Smith has the same interests in bringing this suit as the other members of the Class he seeks to represent; all Class members received the same text message from Microsoft without consent, suffering the same invasion of privacy. Furthermore, Mr. Smith has actively participated in the litigation, filing the case in his own name, responding to discovery requests, agreeing to appear for an upcoming deposition, and subpoenaing his phone records from his cellular phone carrier for Microsoft's inspection.  Smith's pursuit of this matter demonstrates that he will zealously advocate for the Class and put its interests ahead of his own. Thus, Mr. Smith has no interests antagonistic to the interests of the proposed Class.

Proposed class counsel, Michael McMorrow of Smith & McMorrow, P.C. and Evan M. Meyers of McGuire Law, P.C., have regularly engaged in major complex litigation, and have extensive experience in consumer class action lawsuits involving cellular phone technology.  (*See* Declaration of Michael McMorrow ("McMorrow Decl."), attached hereto, ¶¶ 2-5; Meyers Decl., ¶¶ 10-13.)  Plaintiff's counsel have been appointed as class counsel in several complex consumer class actions, including similar TCPA text messaging cases.  *See, e.g., In re Jiffy Lube Int'l, Inc. Text Spam Litigation*, No. 3:11-MD-02261-JM-JMA (S.D. Cal., 2013)*; Lee v. Stonebridge Life Ins. Co. et al.*, No. 11-cv-00043-RS (N.D. Cal. 2013); *Lozano v. Twentieth Century Fox,* No. 09-cv-06344 (N.D. Ill., 2011); *Espinal v. Burger King Corp., et al.,* No. 09-20982 (S.D. Fla., 2010); *In re Kentucky Grilled Chicken Marketing & Sales Practices Litig.*, No. 09-cv-07670 (N.D. Ill. 2011).  (McMorrow Decl., ¶¶ 2-3; Meyers Decl., ¶ 12.)  Accordingly, Plaintiff's counsel will adequately represent the instant Class.

### 5.    *The Proposed Class Also Meets the Standards of Rule 23(b)(3).*

In addition to the Rule 23(a) prerequisites, Plaintiff must also meet one of

the three requirements of Rule 23(b) to certify the proposed class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(b)(3) provides that a class action can be maintained where: (1) the questions of law and fact common to members of the class predominate over any questions affecting only individuals, and (2) the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *Pierce v. County of Orange*, 526 F.3d 1190, 1197 n.5 (9th Cir. 2008). Certification under Rule 23(b)(3) is appropriate and encouraged "whenever the actual interests of the parties can be served best by settling their differences in a single action." *In re Ferrero Litigation*, 278 F.R.D. 552, 559 (S.D. Cal. 2011) (citing *Hanlon* 150 F.3d at 1022)). A case such as this, where individual recoveries would be small and, but for the class action, would not likely be pursued, is a quintessential example of the practical utility of the class action mechanism.

> ### i.    Common Questions of Law and Fact Predominate.

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). When a plaintiff advances a theory of liability in his certification motion, the court should determine whether common issues predominate under this theory without evaluating the theory itself. *See United Steel v. ConocoPhillips Co.,* 593 F.3d 802, 808-09 (9th Cir. 2010). In fact, common legal and factual issues have been found to predominate where the class members' claims arose under the TCPA and where the claims focused on the defendants' advertising campaign. *Kavu, Inc.,* 246 F.R.D. at 650-51; *Paldo Sign &*

*Display Co. v. Topsail Sportswear, Inc.*, 08 C 5959, 2010 WL 4931001, at *3 (N.D. Ill. Nov. 29, 2010).  The predominance test begins "with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011).  The elements of this claim are whether Microsoft made or had made the text message calls, and whether the calls were made using an automated telephone dialing system.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).

Plaintiff presents a cognizable, unified theory of liability in his Motion: that Microsoft made all the text calls to further its Xbox marketing program.  Pursuant to that program, Microsoft attempted to generate traffic to its http://xbox.mobi site through the text message advertisements.  If members of the Class clicked on the hyperlink contained in the text message, they would be directed to Microsoft's Xbox website.  Each Class member's claim will prevail or not based on whether Microsoft can be held liable for the transmission of those text messages.

Furthermore, Microsoft's liability will be determined solely by examining the conduct of Microsoft and its agents, not by the actions of any Class members.  In *Silbaugh*, the Court held that "a single text message marketing campaign . . . which was conducted in the same manner with respect to all the class members" satisfied predominance.  278 F.R.D. at 393.  Plaintiff presents the same theory here, that all the messages were sent in the same manner in furtherance of Defendant's ad campaign.  The use of a single short code and a single phone list from Come & Stay, combined with the transmission of the text messages *en masse* to the entire Class on the same day using the same equipment resulted in text messages being sent in exactly the same manner to each member of the Class.  This makes the questions of whether Microsoft had these text messages sent and whether they were sent using an ATDS common ones that predominate over any individual questions.  *See, e.g., id*. at 393-94.

As noted above, the existence of prior express consent is an affirmative defense to a TCPA claim, not an element of a claim itself. And as also discussed above, whether Microsoft can prove prior express consent is a common question to all Class members. Microsoft admits that it did not obtain any consent itself; it claims to have relied upon a "database" from third-party Come & Stay of "subscribers opted in for a variety of things, such as ringtones, content downloads, and executable files." (Meyers Decl., ¶ 9, Ex. 7 (Response to Interrogatory No. 5.)) In fact, Microsoft's discovery efforts in this case have focused primarily on obtaining "information from Plaintiff and from third parties that may have evidence of … the entity that provided the phone numbers, and the entity that obtained prior express consent from the holders of those phone numbers to receive messages such as the one at issue here." (Dkt. 25 at 3.) Tellingly, twenty months of such searching since the filing of this lawsuit have been to no avail.

Come & Stay (or some other company from which it purchased the list of numbers) was the only source of the wireless phone numbers; even if Come & Stay were to come forward with individualized evidence of consent, the applicability of such consent to Microsoft would still call for a uniform answer, applicable to all Class members. In any event, Microsoft has presented no evidence of consent for any class member; until it does, no "prior express consent" question even exists. Common questions generating common answers appear to be the <u>only</u> questions in this case, and thus easily predominate over individual issues, if any, that may exist.

Questions regarding Microsoft's substantive liability for sending the text messages do not alter this analysis. A determination that Microsoft is liable can, and should, be made equally as to all members of the Class. But even if Microsoft is found not liable on any basis, the common questions still predominate; a determination of liability in Microsoft's favor would, and should, be made equally

as to all members of the Class. *See Stonebridge*, -- F.R.D. ---, 2013 WL 542854, at *3 (rejecting defendant's arguments that its potential lack of legal liability precludes class certification, ruling that "[t]he legal consequences of whatever the precise facts ultimately prove to be can be decided on a class-wide basis.")

*ii.    A Class Action is a Superior Method for Adjudicating this Controversy.*

The use of the class action device to fairly and efficiently adjudicate the Class members' claims is superior to any other method available. The superiority requirement's purpose is one of judicial economy and to assure that a class action is the "most efficient and effective means of resolving the controversy." *Wolin,* 617 F.3d at 1175-76. "Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Id.* at 1175. Moreover, the class action is superior to individual actions in consumer cases with thousands of members, as "Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." *Holloway v. Full Spectrum Lending*, CV 06-5975, 2007 WL 7698843 at *9 (C.D. Cal. June 26, 2007) (citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)).

This case is ideal for class treatment because the claims of Plaintiff and the Class involve identical alleged violations of a federal statute based on a single act by Microsoft and its agents—the transmission of the offending text messages in a single blast to 91,708 consumers. Most members of the proposed Class would find the cost of litigating their claims, each of which is limited in value to $500.00 (or $1,500.00 if a willful violation is shown) prohibitive. Furthermore, litigating these claims in individual actions would be judicially inefficient, as the offending conduct consists of a single act by Microsoft and its agents.

Courts have regularly ruled that a class action is a superior vehicle for resolving TCPA disputes. *See Agne*, 286 F.R.D. at 571 (finding superiority because "[$500] is not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action against a national corporation"); *Kavu,* 246 F.R.D. at 650 (holding that claims under the TCPA and the Washington CPA are sufficiently small such that they are unlikely to be litigated individually); *Bellows v. NCO Fin. Sys., Inc.,* No. 3:07–CV–01413–W–AJB, 2008 WL 4155361, at *8 (S.D. Cal. Sept. 5, 2008) (holding in a TCPA action that "[t]he class action procedure is the superior mechanism for dispute resolution in this matter. The alternative … would be costly and duplicative.") A class action is a superior vehicle here for the same reasons.

Were this case not to proceed on a class-wide basis, it is unlikely that many Class members would be able to obtain redress or that Microsoft and its agents would willingly cease sending text message spam. Current technology provides a strong incentive for advertisers to carelessly or willfully transmit mass text messages at little cost. This can only be countered with the possibility that all of the individuals harmed by such conduct can obtain redress, as the threat of a few individual actions would not deter such conduct. Accordingly, common questions predominate and a class action is the superior method of adjudicating this case.

## B. The Court Should Appoint Plaintiff's Counsel As Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel…[who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the Court must consider counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources

committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Proposed class counsel have diligently investigated Plaintiff's TCPA text-messaging claim and have prosecuted it since its inception; they have devoted, and will continue to devote, the necessary time and resources to this litigation. (Meyers Decl., ¶ 11.)  As discussed above, proposed class counsel have experience with similar class action litigation and have been appointed class counsel in analogous consumer class actions regarding the TCPA.  (McMorrow Decl. ¶¶ 2-3; Meyers Decl., ¶ 12.)  Proposed class counsel also have an in-depth knowledge of the applicable law, having been involved in other TCPA text message litigation. (*See* McMorrow Decl. ¶ 2-3; Meyers Decl., ¶ 12.)  Accordingly, the Court should appoint Plaintiff's counsel, Michael J. McMorrow of Smith & McMorrow, P.C. and Evan M. Meyers of McGuire Law, P.C,. to serve as Class Counsel for the proposed class pursuant to Rule 23(g).[7]

## V.    CONCLUSION

For the reasons discussed above, Plaintiff Neil Smith respectfully requests that the Court enter an order certifying the proposed Class pursuant to Rule 23(b)(3), appointing Michael J. McMorrow and Evan M. Meyers as Class Counsel, and awarding such additional relief as the Court deems reasonable and just.


Dated:  April 24, 2013                     Respectfully submitted,

                                By:   /s/  Michael J. McMorrow
                                One of Plaintiff's Attorneys

---

[7] Upon certification, counsel will present a notice plan to the Court and describe that notice plan's ability to provide notice to the Class that will satisfy due process.

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California   91403
Tel:  (818) 990-1299
Fax: (818) 501-7852

Michael J. McMorrow (admitted *pro hac vice*)
mjmcmorrow@smithmcmorrow.com
SMITH & MCMORROW P.C.
53 West Jackson Blvd., Suite 1663
Chicago, IL 60604
Tel:  (312) 546-6139
Fax: (888) 664-8172

Evan M. Meyers (*pro hac vice* pending)
emeyers@mcgpc.com
McGUIRE LAW, P.C.
161 N. Clark Street, 47th Floor
Chicago, IL 60601
Tel: (312) 216-5179
Fax: 312-275-7895

*Counsel for Plaintiff NEIL SMITH
and the putative class*