Thomas W. McNamara (SBN 127280)
Chrysta L. Elliott (SBN 253298)
BALLARD SPAHR LLP
655 West Broadway, Suite 1600
San Diego, California 92101-8494
Tel:   (619) 696-9200
Fax:   (619) 696-9269
mcnamarat@ballardspahr.com
elliottc@ballardspahr.com

Charles B. Casper (admitted *pro hac vice*)
Jennifer E. Canfield (admitted *pro hac vice*)
MONTGOMERY McCRACKEN
WALKER & RHOADS, LLP
123 South Broad Street, 24th Floor
Philadelphia, Pennsylvania 19109
Tel:   (215) 772-1500
Fax:   (215) 772-7620
ccasper@mmwr.com
jcanfield@mmwr.com

*Attorneys for Defendant*
MICROSOFT CORPORATION

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL SMITH, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>Defendant. | CASE NO. 11-cv-01958-JLS-BGS<br><br>CLASS ACTION<br><br>**[REDACTED] DEFENDANT MICROSOFT CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**JURY TRIAL DEMANDED**<br><br>Complaint Filed: August 25, 2011<br>Judge:    The Hon. Janis L. Sammartino<br><br>Date:    August 15, 2013<br>Time:    1:30 p.m.<br>Dept:    4A |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................1

II.    FACTUAL BACKGROUND ...........................................................2

     A.    Evidence Shows Individual Evidence Is Required. .............................2

     B.    The Limited Evidence Available Shows C&S's Database Included Only Opt-In Numbers. ...................................................................5

     C.    Plaintiff's Needless Delay Caused Crucial Evidence on Consent and the Sources of the Phone Numbers to Disappear. ...........................8

III.   ARGUMENT ..................................................................................10

     A.    Smith's Proposed TCPA Class Fails to Satisfy the Commonality, Predominance, Superiority, and Ascertainability Requirements...11

         1.    Microsoft's Evidence Demonstrates Lack of Commonality, Predominance, and Superiority...........................................11

         2.    The Proposed Class is Unascertainble......................................19

     B.    Smith and His Attorneys Will Inadequately Protect the Class's Interests and Smith's Delay Makes Him Atypical. .......................21

         1.    Smith and His Attorneys Unreasonably Delayed...................22

         2.    Microsoft Suffered Evidentiary Prejudice...............................22

         3.    Smith's Delay Makes Him Atypical of the Other Proposed Class Members.......................................................................24

     C.    Smith is an Inadequate Class Representative Because He Does Not Know His Attorneys, What the TPCA is, Where His Attorneys Filed the Case, or What Relief His Complaint Seeks...................24

IV.   CONCLUSION ..............................................................................25

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. FACTUAL BACKGROUND ..................................................................2

    A. Evidence Shows Individual Evidence Is Required. .............................2

    B. The Limited Evidence Available Shows C&S's Database Included Only Opt-In Numbers. .......................................................................5

    C. Plaintiff's Needless Delay Caused Crucial Evidence on Consent and the Sources of the Phone Numbers to Disappear. .............................8

III. ARGUMENT .........................................................................................10

    A. Smith's Proposed TCPA Class Fails to Satisfy the Commonality, Predominance, Superiority, and Ascertainability Requirements...11

        1. Microsoft's Evidence Demonstrates Lack of Commonality, Predominance, and Superiority.............................................11

        2. The Proposed Class is Unascertainble......................................19

    B. Smith and His Attorneys Will Inadequately Protect the Class's Interests and Smith's Delay Makes Him Atypical. .......................21

        1. Smith and His Attorneys Unreasonably Delayed....................22

        2. Microsoft Suffered Evidentiary Prejudice...............................22

        3. Smith's Delay Makes Him Atypical of the Other Proposed Class Members.....................................................................24

    C. Smith is an Inadequate Class Representative Because He Does Not Know His Attorneys, What the TPCA is, Where His Attorneys Filed the Case, or What Relief His Complaint Seeks....................24

IV. CONCLUSION .....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A Aventura Chiropractic Ctr., Inc. v. Med. Waste Mgmt. LLC*,
    2013 WL 2243972 (S.D. Fl. May 21, 2013) ................................................ 15, 16

*Agne v. Papa John's Intl, Inc.*,
    286 F.R.D. 559 (W.D. Wash. 2012) ......................................................... 20, 21

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) .......................................................................................... 12

*Blitz v. Agean, Inc.*,
    __S.E.2d__, 2013 WL 2395970 (N.C. June 4, 2013) ................................. 15, 16

*Bridging Cmtys, Inc. v. Top Flite Fin., Inc.*
    2013 WL 2417939, at *2-*3 (E.D. Mich. June 2, 2013).............................. 15, 16

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
    141 F.R.D. 144 (N.D. Cal. 1991) .................................................................... 25

*CE Design Ltd. v. Cy's Crabhouse North, Inc.*,
    259 F.R.D. 135 (N.D. Ill. 2009) ...................................................................... 14

*Clapper v. Amnesty Int'l, USA*,
    133 S. Ct. 1138 (2013) ..................................................................................... 18

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ............................................................................... 10, 12

*Connelly v. Hilton Grand Vacations Co., LLC*,
    2012 WL 2129364 (S.D. Cal. June 11, 2012) .................................................. 13

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001) ................................................................. 21, 22, 23

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ........................................................................... 10

*Emanuel v. Los Angeles Lakers, Inc.*,
    2013 WL 1719035 (C.D. Cal. Apr. 18, 2013).................................................. 11

*Fid. Fed. Bank & Trust v. Kehoe,*
    547 U.S. 1051 (2006) ...................................................................................... 19

*Forman v. Data Transfer*, Inc.
    164 F.R.D. 400, 405 (E.D. Pa. 1995) .................................................... 12, 14, 17

*G.M. Sign, Inc. v. Group C. Comm., Inc.*,
    2010 WL 744262 (N.D. Ill. Feb. 25, 2010) ......................................................... 14

*Gannon v. Network Tel. Serv., Inc.*,
    2013 WL 2450199 (C.D. Cal. June 5, 2013) ....................................................... 17

*Gene & Gene LLC v. BioPay LLC*,
    541 F.3d 318 (5th Cir. 2008) ...................................................... 11, 13, 14

*Gormley v. Nike Inc.*,
    2013 WL 322538 (N.D. Cal. Jan. 28, 2013) ....................................................... 24

*Hartman v. United Bank Card Inc.*,
    2012 WL 4758052 (W.D. Wash. Oct. 4, 2012) ................................................... 17

*Hicks v. Client Servs., Inc.*,
    2008 WL 5479111 (S.D. Fla. Dec. 11, 2008) .............................................. 13, 14

*Hinman v. M & M Rental Cr.*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008) ................................................................. 14

*Internet Specialties West, Inc. v. Milon-Digiorgio Enter., Inc.*,
    559 F.3d 985 (9th Cir. 2009) .............................................................................. 22

*Jackson v. Axton*,
    25 F.3d 884 (9th Cir.1994) ................................................................................. 22

*Jamison v. First Credit Servs.*,
    2013 WL 1248306 (N.D. Ill Mar. 28, 2013) ......................................... 1, 19, 20

*Kavu, Inc. v. Omnipack Corp.*,
    246 F.R.D. 642 (W.D. Wash. 2007) ................................................................... 14

*Kenro, Inc. v. Fax Daily, Inc.*,
    962 F. Supp. 1162 (S.D. Ind. 1997) ................................................................... 14

*Kling v. Hallmark Cards, Inc.*,
    225 F.3d 1030 (9th Cir. 2000) ............................................................................ 21

*Levitt v. Fax.com*,
   2007 WL 3169078 (D. Md. May 25, 2007) ............................................ 11, 15, 16

*Lipton v. Chattem, Inc.*,
   289 F.R.D. 456 (N.D. Ill. 2013) ............................................................ 24

*Livingston v. U.S. Bank, N.A.*,
   58 P.3d 1088 (Colo. Ct. App. 2002) ...................................................... 14

*Lyon v. Gila River Indian Community*,
   626 F.3d 1059 (9th Cir. 2010) ............................................................... 23

*Machesney v. Lar-Bev of Howell, Inc.*,
   ___ F.R.D. ___, 2013 WL 1721150 (E.D. Mich. Apr. 22, 2013) ...................... 13

*Maracich v. Spears*,
   131 S. Ct. 2191 (2013) ........................................................................ 18

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) ...................................................... 19, 20, 21

*Mazur v. eBay Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009) ............................................. 10, 21, 24

*Mazza v. Am. Honda Motor Co.*
   Inc., 666 F.3d 581, 588 (9th Cir. 2012) .............................. 10, 11, 19

*McPhail v. First Command Fin. Planning, Inc.*,
   247 F.R.D. 598 (S.D. Cal. 2007) ......................................................... 24

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) ................................................ 11, 13, 14

*Mims v. Arrow Fin. Servs., LLC*,
   132 S. Ct. 740 (2012) ......................................................................... 18

*Minkler v. Kramer Laboratories*,
   2013 WL 3185552 (C.D. Cal. Mar. 1, 2013) ......................................... 25

*New Era Publ'n Intern., ApS v. Henry Holt and Co., Inc.*,
   873 F.2d 576 (2d Cir. 1989) ................................................................ 21

*Pinkard v. Wal-Mart Stores, Inc.*,
   2012 WL 5511039 (N.D. Ala. Nov. 9, 2012) ............................................ 1

*Quesada v. Banc of Am. Inv. Servs., Inc.*,
    2013 WL 623288 (N.D. Cal. Feb. 19, 2013) ...................................................... 14

*Roberts v. Paypal*,
    2013 WL 2384242 (N.D. Cal. May 30, 2013) ..................................................... 1

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ............................................................................. 1

*Saul Zaentz Co. v.Wozniak Travel, Inc.*,
    627 F. Supp. 2d 1096 (N.D. Cal. 2008)............................................................. 23

*Torres v. Nutrisystem, Inc.*,
    __F.R.D.__, 2013 WL 1907890 (C.D. Cal. Apr. 8, 2013) ................................ 14

*Vanderwort v. Balboa Capital Corp.*,
    287 F.R.D. 554 (C.D. Cal. 2012) ...................................................................... 13

*Vigus v. S. Illinois Riverboat/Casino Cruises, Inc.*,
    274 F.R.D. 229 (S.D. Ill. 2011) .....................................................15, 17, 19, 20

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ...................................................10, 11, 17, 24

*Wang v. Chinese Daily News, Inc.*,
    709 F.3d 829 (9th Cir. 2013) ............................................................................ 13

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) .......................................................................... 12

**STATUTES**

47 U.S.C. § 227(b)(1)(A)...........................................................................................11

**OTHER AUTHORITIES**

47 C.F. R. § 64.1200(a)(4)(ii)(B) ............................................................................. 14

Fed. R. Civ. P. 23..................................................................................................2, 10

Fed. R. Civ. P. 23(a)(3)............................................................................................ 24

Fed. R. Civ. P. 23(a)(4)............................................................................................ 21

Fed. R. Civ. P. 23(b)(3) ......................................................................................10, 11

# I.    <u>INTRODUCTION</u>

In September 2008, Microsoft's advertising agencies, Iconmobile, LLC, and Young & Rubicam, Inc. ("Wunderman"), used a now-defunct company called Come&Stay, Inc. ("C&S") to send two versions of a single text message to numbers included in C&S's opt-in database.  Microsoft has no record of any complaints about that text message.

Plaintiff argues the Court can certify a class of 91,708 phone numbers that supposedly received the text on a list provided by m-Qube, Inc. because Microsoft "is either liable for a TCPA violation for all 91,708 Class members or it is not liable at all."  Pl. Memo 12.  Not so for four reasons.

***First,*** testimony from some of the numbers' current subscribers shows it was impossible for at least 24% of the 91,708 to receive text messages because they were landlines or cell phones with text messaging blocked in September 2008. The only way to prove which of the 91,708 could receive a text message is to call the number and ask.  But even calling each number would not resolve who received the calls because at least 25% are disconnected or no longer in service, many more go unanswered when called, and some subscribers who know the number is a landline today are unsure about 2008, requiring more individual investigation.   And the only way to determine consent is to ask whether the subscriber or other people allowed to use the phone consented.[1]  The 91,708 mini-trials needed to answer these fundamental questions destroy commonality, predominance, and superiority.

---

[1] The TCPA treats text messages and telephone calls the same.  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).  An individual who consents to receive promotional messages by providing a telephone number agrees to receive both telephone calls and text messages.  *Pinkard v. Wal-Mart Stores, Inc.*, 2012 WL 5511039, at *3-*5 (N.D. Ala. Nov. 9, 2012) (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8572, 8769 ¶31 (Oct. 16, 1992)); *Roberts v. Paypal*, 2013 WL 2384242, at *4 (N.D. Cal. May 30, 2013) (adopting reasoning in *Pinkard* and concluding plaintiff consented to receive text by providing cell phone number to Paypal).

**Second**, a class of "[a]ll individuals that received" the text message, Pl. Memo 7, cannot be ascertained from m-Qube's list as Plaintiff proposes. At least 24% of the 91,708 numbers never "received" the text message, and for those that did, the nearly five-year time lapse makes it likely many current subscribers were not the "individuals that received" the text message in 2008.

**Third,** Microsoft's evidence shows recipients may have given consent to Microsoft even if not to C&S or its suppliers.

**Fourth**, most of the first-hand evidence of consent disappeared long ago because Plaintiff and his attorneys waited nearly three years to file this lawsuit. By the time they filed in August 2011, C&S's U.S. operations had been shuttered for two years and its records were gone. In December 2011, C&S's former Director of Mobile Marketing, Robert Fuchs, the only person who knew where C&S got the numbers and how subscribers consented, died suddenly at age forty-five. And Microsoft no longer had records of the 25,000 numbers that Xbox fans gave it for text messages.

Beyond these defects, Smith fails to satisfy additional Rule 23 requirements because his claims are atypical and neither he nor his attorneys are adequate representatives. They unreasonably delayed filing suit, subjecting Smith to the defense of laches. And Smith knows little about the case and does not want the primary relief his attorneys seek.

The rigorous analysis to which Plaintiff's motion must be subjected yields one conclusion here: class certification should be denied.

## II.     FACTUAL BACKGROUND

### A.     Evidence Shows Individual Evidence Is Required.

On September 12, 2008, C&S sent two similar versions of a text message inviting recipients to visit www.xbox.mobi, a website designed for cellular telephones. Pl. Memo 13. ████████████████████████

████████ Declaration of Thomas W. McNamara ("TWM Decl.") ¶3, Ex. 1 at

75:14-17 (Deposition of Neil Smith). ███████████████, *id.* at 38:21-40:7, and ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████,” *id.* at 99:23-103:5. ██████████████████████████ ██████████████████ ███████ ████████. *Id.* at 13:1-16. ███ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████.” *Id.* at 64:17-22. ██ ██████████████████████████████████████████████████████████ ██████████████████████. *Id.* at 75:14-76:5. In fact, ████████ ██████████████████████████████████████████████████████████ ███████████████████████. TWM Decl. ¶4, Ex. 2. But he and his attorneys then waited almost another year, until August 25, 2011, before filing this lawsuit. ██████████████████████████████████████████████████. TWM Decl. ¶3, Ex. 1 at 67:2-68:9. More than a year after that, Plaintiff subpoenaed a list of telephone numbers from aggregator m-Qube. He claims "liability for transmitting" the text message is "easily resolved 'in one stroke' on a class wide basis" because Microsoft is "either liable for a TCPA violation for all 91,708 Class members, or it not liable at all." Pl. Memo 12. But testimony from current subscribers to numbers on m-Qube's list proves otherwise and shows individual investigation is necessary to ascertain class membership.

Diane Bigler, Ryan Stewart, Mark Balazs, Gregg Sutherland, Tracy Wells, David Chemelewski, and Phyllis Lynch all testify their numbers have been landlines since before September 2008 and could not have received a text message. Declarations of Diane Bigler ¶¶2-3; Ryan Stewart ¶¶2-3; Mark Balazs ¶¶2-3;

---

[2] Judge Anderson dismissed *Airit2Me Inc. v. Weinstein* on Dec. 18, 2008 after approving a class settlement. Microsoft's Request for Judicial Notice ("RJN") Ex. 1 (Case No. 1:06cv00484 (N.D. Ill.)).

[3] Myles McGuire is the attorney who signed Plaintiff's fee agreement here but is not counsel of record. TWM Decl. ¶¶4-5, Exs. 2, 3.

Gregg Sutherland ¶¶2-3; Tracy Wells ¶¶2-3; David Chemelewski ¶¶2-3; and Phyllis Lynch ¶¶2-3. And David Brown had "texting service blocked" on September 12, 2008, and is " certain" he "did not receive any advertising text messages" in September 2008. Declaration of David A. Brown ¶¶2-4.

Individual interviews and investigation of 163 of 1,155 numbers randomly selected from m-Qube's list revealed 30% (49 of 163) were landlines or cell phones incapable of receiving text messages in 2008. Declaration of Lecia Kaslofsky ("Kaslofsky Decl.") ¶¶11-13. Based on this sampling, Professor Scott Rifkin, who teaches statistics at U.C.S.D., calculates with 95% certainty that at least 24% of the phone numbers on m-Qube's list—22,147 of them—were landlines or cell phones incapable of receiving text messages in September 2008. Declaration of Professor Scott Rifkin ("Rifkin Decl.") ¶7.

Others acquired phone numbers on m-Qube's list after 2008 and thus cannot be class members. Kaslofsky Decl. ¶13. 27% (313 of 1,155) of the numbers called are disconnected or no longer in service. *Id.* ¶10. Professor Rifkin calculates with 95% certainty at least 24% of the phone numbers on m-Qube's list are disconnected or no longer in service. Rifkin Decl. ¶9. And 53% (615 of 1,155) went to voicemail or rang continuously. Kaslofsky Decl. ¶10. Finally, despite the passage of time, one recipient testified, "it is likely that I did consent to receive that type of text message." Declaration of Owen K. Gregory ("Gregory Decl.") ¶¶3-4.

The only way to prove which of the 91,708 could have received the text in 2008 is to ask each person—an overwhelmingly individual undertaking. Even when someone answers, tracking down the subscribers in 2008 requires individual investigation. And proposed class members like Mr. Gregory, who believes he consented, confirm the individual nature of the evidence. Plaintiff's assertion that class-wide evidence can show whether every person on the list received the text and opted in is just plain wrong.

For those persons who could have received the text, evidence shows many may have given Microsoft consent to receive texts about Xbox. In 2008, many people interested in Xbox expressly consented to receive texts when registering for an Xbox Live account, entering contests, texting various phrases to 30360, or visiting Xbox.com.mobile from a cell phone. Xbox.com registrants could enter a phone number next to "████████████████████████████████████████ ████████████████████████e." TWM Decl. ¶6, Ex. 4, (MS1209)[4]; Declaration of Robert Ziemak ("Ziemak Decl.") ¶5, Ex. 2. Gold (paid) members of Xbox Live, Microsoft's online service, ████████████████████████████████████ ████████████████████████████████████████████████████████." TWM Decl. ¶7, Ex. 5 (MS1300). Registrants could ████████████████ "████████████████████████████████████████████████████." *Id.* (MS1211). Xbox fans could "████████████████████████████████████ ████████████████████████████████████████████████████████ ████." TWM Decl. ¶9, Ex. 7 (MS369), ¶10, Ex. 8 (MS451), ¶8, Ex. 6 (MS1288, 1290, 1294).

By May 2008, ████████████████████████████████████ ████████████████████████████████. TWM Decl. ¶11, Ex. 9 (MS1302). But the passage of time prevents Microsoft from cross-checking numbers on m-Qube's list with persons who gave Microsoft consent before September 2008. Ziemak Decl. ¶9.

**B. The Limited Evidence Available Shows C&S's Database Included Only Opt-In Numbers.**

Before retaining C&S to send the text message, Iconmobile vetted the company, in keeping with its and Wunderman's agreement to "████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. TWM Decl. ¶12, Ex.

---

[4]Microsoft's documents, MS-SMITH_00000###, are abbreviated "MS####."

10 (MS 164) at ¶3(e)(iii), 8(a)(iii), ¶13, Ex. 11 (MS 108) at ¶2.2(a), ¶14, Ex. 12 (MS830), ¶15, Ex. 13 (MS842). Iconmobile warranted that the campaign "███████ ████████ █████ ████████.” *Id.* at ¶9, Ex. 7 (MS367). The MMA, Iconmobile, and Microsoft all require text message recipients to opt in. *Id.* ¶9, Ex. 7 (MS368); ¶16, Ex. 14 (MS313); ¶18, Ex. 16 (MS856-74); ¶19, Ex. 17 (MS894).

C&S, an international company with headquarters in Paris and offices in twelve countries, met these standards. Declaration of Michael Richmond ("Richmond Decl.")) ¶2. C&S conducted ███████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████.” TWM Decl. ¶17, Ex. 15 (MS272-78). In late 2007, a Microsoft employee learned of C&S by attending a C&S presentation at an advertising conference in London. *Id.* Microsoft forwarded C&S's website to Iconmobile's Eric Wingren to "████████████ ████████████████████████████████████s.” Richmond Decl. ¶¶4-6, Ex. 3 (ICM603-04).[6]

Michael Richmond, C&S's U.S. general manager of sales, assured Wingren C&S had an "████████████████████████████████████████████ ████████████████████████████████████████████████████.” Richmond Decl. ¶¶5-6, Exs. 2, 3 (ICM042-43, 603-04). C&S worked with reputable customers like the "████████████████████████████████ ████████████████████████.” Richmond Decl. at Ex. 1 (ICM042-43).

Wingren "██████████████████████████████████████████ ████████.” *Id.* at Ex. 3 (ICM603-04). Wingren later explained C&S had about "████████████████████████████████████████████████████.” *Id.* It

---

5 Mobile Marketing Association. TWM Decl. ¶9, Ex. 7 (MS367).

[6] Iconmobile's documents, ICONMOBILE000###, are abbreviated "ICM###."

3470611v12                                6                    Case No. 11-cv-01958-JLS-BGS
                                                  MICROSOFT'S OPPOSITION TO CLASS CERTIFICATION

acquired users through "'█████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████.'" *Id.*

Wingren ████████████████████████████████████████████.

Richmond Decl. ¶¶5-6. Because Richmond's work was mostly "e-mail marketing," *id.* ¶3, he asked Robert Fuchs, the C&S employee "in charge of implementing text message campaigns and other mobile marketing services," and "responsible for acquiring the cell phone numbers and arranging for the text messages to be sent." *Id.* As Fuchs explained, "some of the databases of mobile phone numbers [C&S] used for text message campaigns were supplied by other companies and provided to [C&S] under agreements with those companies." *Id.* ¶10. But Richmond does not know who those companies were, C&S's records disappeared, and Mr. Fuchs is dead. *Id.* ¶¶4, 10. "Nearly all of [Richmond's] knowledge about how C&S's mobile marketing worked, and how permissions were obtained, came from … Mr. Fuchs." *Id.* ¶3.

C&S's website corroborated Fuchs's assurances. "Target your existing and potential customers via mobile. Choose from over 37 million opt-in mobile numbers worldwide …" TWM Decl. ¶20, Ex. 18 (MS002); *see also id.* at MS003, ¶21, Ex. 19 (MS012), ¶ 22, Ex. 20 (MS017). In the website Wingren reviewed, C&S described itself as "the global leader in … mobile advertising," with "access to a total worldwide network of 300 million 'opt-in' permission based … mobile contacts, of which 148 million are 'in-house' owned." *Id.* at ¶23, Ex. 21 (MS022). Some of the "'opt-in' … mobile phone numbers come from our partners—internet sites and/or owners of populated customer databases." *Id.* C&S's privacy page confirmed the "mobile marketing permission policy includes both 'opt-in' and 'opt-out.' This means an active user must first give permission to receive advertising," *id.* at ¶24, Ex. 22 (MS020), and then be given an opportunity to change his mind by opting out. Mobile Marketing Magazine's October 2007

article describing C&S's opt-in database reported: "the numbers come from the company's partner network, and are collected mainly online.   All supplying partners have to sign a contract to guarantee that the numbers are truly opted in." *Id.*   ¶20, Ex. 18 (MS009).   And www.brandmag.co.uk's November 2007 article described C&S as a "[r]egular ad:tech exhibitor," that ensures "mobile marketing reaches the right contacts through its database of subscribers willing to receive alerts."  *Id.* at MS006.  C&S helped its clients use mobile advertising "by sending mobile advertisements to subscribers who have agreed to receive mobile advertising."  *Id.*  "5 to 10[%] of these subscribers … come from [C&S's] own services … .   The rest of the subscribers are from websites that have agreed to partner with [C&S].   These websites have customers who have agreed to be contacted by a third party."   *Id.* And before transmitting messages, m-Qube received a contractual warranty that "'opt-in' consent" had been obtained.  *Id*. ¶¶25-26, Ex. 23, 24.

The CEO of C&S's U.S. office from 2006 until November 2008, Shawn McNamara, agreed C&S "used only permission-based … mobile telephone marketing."  Declaration of Shawn K. McNamara ("S. McNamara Decl.") ¶¶4-5. C&S "arranged for … text messages to be sent only to persons who gave their express consent to receive them," and confirmed C&S's "Web page accurately describes my understanding of" C&S's practices.  *Id.* ¶¶5-6, Ex. 1 (MS020).

### C.   Plaintiff's Needless Delay Caused Crucial Evidence on Consent and the Sources of the Phone Numbers to Disappear.

After the text message went out, ***Microsoft and C&S did not record a single complaint from recipients claiming they did not opt in.***   Indeed, while McNamara was CEO, C&S never "received a single complaint about a text message sent to someone who had not given consent … .   No client or cell phone number aggregator we dealt with ever informed me, or to my knowledge any of my employees, that we sent text messages to persons who did not consent."   S.

McNamara Decl. ¶ 8. The only complaint Microsoft received was Plaintiff's Complaint, filed on August 25, 2011, nearly three years later.

Microsoft immediately investigated after receiving Smith's Complaint, but by then crucial evidence was gone. In late November 2008—nearly three years earlier—Carole Walter, CEO of C&S's French parent, flew to the U.S. and fired Richmond and other U.S. employees; in 2009, she closed C&S's U.S. office, and its records disappeared. Richmond Decl. ¶ 9.

In December 2011, Fuchs, the person with "[n]early all of" the "knowledge about how [C&S's] mobile marketing worked, and how permissions were obtained," died unexpectedly at age forty-five. Richmond Decl. ¶3. His testimony would have been crucial because he could have testified as to the sources of the opt-in database and confirmed consent.

After discovering C&S's involvement and finding out it closed its U.S. offices and the key witness was dead, Microsoft hired a French law firm in July 2012 to obtain evidence from the French parent, now called Social Mix Media Group ("SMMG"). Declaration of Béatrice Delmas-Linel ("Delmas-Linel Decl.") ¶2. SMMG did not cooperate, so Microsoft began legal proceedings in Paris in December 2012. *Id.* ¶4. On January 21, 2013, Microsoft obtained an order appointing an accounting expert to inspect SMMG's records. *Id.* ¶¶8-9, Ex. 5. But SMMG challenged it, forcing Microsoft to go before a three-judge panel on April 24, 2013. *Id.* ¶¶10-11, Ex. 6. The court appointed the expert on May 24, 2013, and he inspected the C&S's hard-copy accounting records—the only U.S. records still available—on June 13 and 19, 2013. *Id.* ¶¶11- 12, Ex. 7, 8.

The expert located an invoice to Iconmobile, but concluded the records "do not make it possible to determine whether the service was performed directly by [C&S] or if [C&S] hired a third party to take part." *Id.* ¶12, Ex. 8. He tried to identify accounting entries to "make it possible to identify third parties which might have taken part to this kind of service[]" in the relevant time period, *id.*, but

so far his report leads only to dead ends, not to sources of numbers on m-Qube's list.[7]  SMMG provided no information about numbers in C&S's own database.

## III.   **ARGUMENT**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation marks and citation omitted). "To come within the exception," Smith "'must affirmatively demonstrate his compliance with' Rule 23," *id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2251-52 (2011)), by showing "numerosity, commonality, typicality and adequacy of representation," *Mazza v. Am. Honda Motor Co.*, Inc., 666 F.3d 581, 588 (9th Cir. 2012).  Because Smith relies on Rule 23(b)(3) he must demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods."  Fed. R. Civ. P. 23(b)(3); *Dukes*, 131 S. Ct. at 2548. "The United States Supreme Court requires district courts to engage in a 'rigorous analysis' of each" Rule 23 factor.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quotation marks and citation omitted); *Comcast*, 133 S. Ct. at 1433.  And Smith "must demonstrate that an identifiable and ascertainable class exists."  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

Here, whether phones on m-Qube's list were capable of receiving text messages, and whether the owners of those numbers consented, can be resolved only through individual proof.   Smith's proposed class cannot satisfy the commonality, predominance, superiority, or ascertainability requirements.  Nor can Smith satisfy the adequacy and typicality requirements because of his and his attorneys' unreasonable delay in filing suit, and his lack of knowledge about the

---

[7] Microsoft is still investigating some names in his report.  If any prove to be sources, we will ask the Court for permission to file a supplemental report.

case and disagreement with the primary relief his attorneys seek.

> **A.** **Smith's Proposed TCPA Class Fails to Satisfy the Commonality, Predominance, Superiority, and Ascertainability Requirements.**

"Numerous courts, citing the lack of commonality, typicality and predominance of common issues, have determined that TCPA claims cannot be brought as a class action." *Levitt v. Fax.com*, 2007 WL 3169078, at *4 (D. Md. May 25, 2007) (citing cases). Courts nationwide recognize that "the unique facts of each [TCPA] case generally will determine whether certification is proper," requiring plaintiffs to "advance a viable theory employing generalized proof to establish liability with respect to the class involved." *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008).

The TCPA prohibits autodialed calls to a cellular telephone number without "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). "The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2361 (2013); *Emanuel v. Los Angeles Lakers, Inc.*, 2013 WL 1719035, at *2 (C.D. Cal. Apr. 18, 2013).

> **1.** **Microsoft's Evidence Demonstrates Lack of Commonality, Predominance, and Superiority.**

Contrary to Plaintiff's assertion, commonality is no longer "construed permissively." Pl. Memo 10. "What matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (quotation marks and citation omitted). Commonality requires claims to "depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Mazza*, 666 F.3d at 588 (quotation marks and citation omitted). And Rule 23(b)(3)'s predominance inquiry testing "whether

proposed classes are sufficiently cohesive to warrant adjudication by representation" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997), "is even more demanding," *Comcast*, 133 S. Ct. at 1432. Similarly, a class action is not "superior to other methods of adjudication" where "classwide litigation of common issues will" neither "reduce litigation costs" nor "promote greater efficiency." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quotation marks and citation omitted); *Forman v. Data Transfer*, Inc., 164 F.R.D. 400, 405 (E.D. Pa. 1995).

Relying on his "permissive" view of commonality, Plaintiff contends liability presents a common question with predominantly common issues because Microsoft supposedly "is either liable for a TCPA violation for all 91,708 Class members or it is not liable at all." Pl. Memo 12, 22-23. He argues consent is a common question on which common issues predominate because: (1) there is no evidence of consent and (2) C&S or a "company from which it purchased the list of numbers … was the only source," of the phone numbers. Pl. Memo 15-16, 22. Plaintiff says even if Microsoft could show every person in the C&S database consented, "common questions still predominate." *Id.* 22-23.

Plaintiff is wrong. First, whether a number on m-Qube's list could have received the text message presents an individual issue. Second, although Microsoft believes the text messages were sent only to those who consented to receive telephone calls or text messages, the question cannot be resolved in plaintiff's favor across the board here because ***C&S's records are no longer available, the key witness is dead,*** and Microsoft's evidence shows individuals ***did*** consent.

          **a.**     **Whether a Telephone Number on m-Qube's List Could Have Received the Text Message is Not a Common Question but Presents Individual Issues.**

At least 24% of the phone numbers on m-Qube's list could not have received a text message in 2008. Rifkin Decl. ¶ 7. For those numbers, consent is irrelevant because they never got the message. But calling each number and asking is the

only way to find out if the number in question could have received it. 91,708 mini-trials preclude commonality, predominance, and superiority.

The individual testimony needed goes beyond whether the number was a landline or could receive texts in 2008 because the number may belong to a different subscriber now than in September 2008, may be disconnected, or may not be answered when called. All would require individual investigations to track down the 2008 subscriber, if it could be done at all. Kaslofsky Decl. ¶¶10-13; *Machesney v. Lar-Bev of Howell, Inc.*, ___ F.R.D. ___, 2013 WL 1721150, at *19 (E.D. Mich. Apr. 22, 2013) (fax numbers "associated with telephone numbers that existed *six to seven years ago* … is likely outdated and there would be no easy way of determining current contact information for many of those entities connected to those phone numbers years ago.").

### b. Microsoft's Evidence that Some Recipients Consented Presents Individual Issues.

"Whether Plaintiffs gave the required prior express consent is an affirmative defense to be raised and proved by a TCPA defendant … and is not an element of Plaintiff's TCPA claim." *Connelly v. Hilton Grand Vacations Co., LLC*, 2012 WL 2129364, at *3 (S.D. Cal. June 11, 2012) (citations omitted). Microsoft respectfully disagrees, *see Meyer,* 707 F.3d at 1043, but, even if consent is an affirmative defense, a defendant opposing class certification has "'the right to raise any individual affirmative defenses it may have.'" *Vanderwort v. Balboa Capital Corp.*, 287 F.R.D. 554, 558, 560 (C.D. Cal. 2012) (quoting *Dukes*, 131 S. Ct. at 2561); *see also Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 836 (9th Cir. 2013) (Defendants "entitled to litigate any individual affirmative defenses they may have to class members' claims" for damages); *Gene & Gene*, 541 F.3d at 327 ("[T]he predominance of individual issues necessary to decide an affirmative defense may preclude class certification.") (quotation marks and citation omitted); *Hicks v. Client Servs., Inc.*, 2008 WL 5479111, at *8 (S.D. Fla. Dec. 11, 2008) ("Whether the burden is on the Plaintiff or the Defendant, ultimately consent is an

issue that would have to be determined on an individual basis at trial."). Microsoft bears no liability unless recipients did not consent. But determining whether each proposed class member consented requires individual proof. *Id.*; *Forman*, 164 F.R.D. at 403-04.

Some courts find consent does not bar class certification where, unlike here, defendant has no evidence of consent or where a third party's method of acquiring consent can be examined with common evidence. *Meyer*, 707 F.3d at 1042; *G.M. Sign, Inc. v. Group C. Comm., Inc.*, 2010 WL 744262, at *3 (N.D. Ill. Feb. 25, 2010); *Hinman v. M & M Rental Cr.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008). Here, Plaintiff claims Microsoft has no such evidence. Pl. Memo 22.[8] Not so. In fact, the evidence from C&S and its former employees shows consent (and Microsoft would have more had Plaintiff not unreasonably delayed in filing suit).

Despite the passage of time and the discarded records, Microsoft found a proposed class member who believes he consented. Gregory Decl. ¶¶3-4. In these circumstances, many courts find proving identity and consent predominantly individual. *Gene & Gene*, 541 F.3d at 328-29; *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1169 (S.D. Ind. 1997); *Livingston v. U.S. Bank, N.A.*, 58 P.3d 1088, 1090-91 (Colo. Ct. App. 2002); *see also Torres v. Nutrisystem, Inc.*, __F.R.D.__, 2013 WL 1907890, at *5 (C.D. Cal. Apr. 8, 2013) (whether persons consented to call recording does not present a common question); *Quesada v. Banc of Am. Inv. Servs., Inc.*, 2013 WL 623288, at *7 (N.D. Cal. Feb. 19, 2013) (same).

Even if C&S misrepresented its database as opt-in—and there is no evidence it did—recipients may be among the 25,000 who opted in to receive text messages

---

[8] Unlike in *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009) and *Kavu, Inc. v. Omnipack Corp.*, 246 F.R.D. 642 (W.D. Wash. 2007), where defendants "took no steps to verify consent," Iconmobile investigated C&S. *CE Design*, 259 F.R.D. at 143; *Kavu*, 246 F.R.D. at 647. And here, no FCC regulation required senders "take reasonable steps to verify" consent. 47 C.F. R. § 64.1200(a)(4)(ii)(B); *Kavu*, 246 F.R.D. at 647; *CE Design*, 259 F.R.D. at 143.

about Xbox from Microsoft, rendering class certification inappropriate because many numbers on m-Qube's list may belong to persons who gave Microsoft direct consent.[9] *Blitz v. Agean, Inc.*, __S.E.2d__, 2013 WL 2395970, at *5 (N.C. June 4, 2013); *Levitt*, 2007 WL 3169078, at *4. In *Blitz*, the North Carolina Supreme Court affirmed the denial of class certification where "customers requested information and some" consented to receiving faxes. *Id.* Because the numbers came from a database that included numbers from area codes near defendant, "there was a likelihood of some overlap between numbers from the [database] and defendant's Customer List." *Id.* Moreover, "plaintiff was the only individual on the list of the 978 recipients who" complained. *Id.; see also A Aventura Chiropractic Ctr., Inc. v. Med. Waste Mgmt. LLC*, 2013 WL 2243972, at *9 (S.D. Fl. May 21, 2013) (certification denied where numbers came from one or two lists but evidence showed "many customers or potential customers asked for information … , and some of those may be among" the numbers in the lists).

Similarly*, in *Bridging Cmtys, Inc. v. Top Flite Fin., Inc.*, the operator of the business that sent faxes testified she obtained the numbers from another company. 2013 WL 2417939, at *2-*3 (E.D. Mich. June 3, 2013). Even assuming she "did not obtain 'express invitation or permission' from any of the proposed class members, that … does not foreclose the possibility that some of those members gave consent to [d]efendant and or [database supplier] prior to receiving the facsimiles." *Id.* at *3. "The factual core of [a TCPA] case is not whether [d]efendant sent facsimile transmissions but, rather, whether each of the *individual* class members solicited the facsimiles." *Id.* at *2; *see also Vigus v. S. Illinois Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 237 (S.D. Ill. 2011) (determining consent "will depend on individual examination of the identity of the assignee for

---

[9] Plaintiff's unreasonable delay prevents Microsoft from cross-checking m-Qube's list with its 2008 records. Ziemak Decl. ¶9.

each number on the list at the time of each call").

The additional wrinkle of the unavailability of the source of the numbers precludes certification. *Levitt*, 2007 WL 3169078, at *4. There, the entity that sent faxes, Fax.com, went out of business during the course of the litigation and could not participate—just like C&S. The court recognized:

> It is conceivable, while the actual transmitter of the facsimiles … was available to actively participate in this litigation, that these issues could have been resolved in some more global fashion … . Plaintiff averred that Fax.com had a database and log of the transmissions at issue… . ***Information that Fax.com might have as to the source of its databases might be instructive as to issues of consent: was the database constructed from customer lists provided by CMC, lists purchased from some third party, numbers generated by Fax.com computers randomly dialing and hunting for fax machines, or some combination thereof?***

*Id.* (emphasis added). Because the defendant did not have "any information regarding the content or construction of the databases used by Fax.com," *id.* at *5, class treatment was "inappropriate and unmanageable," *id.* at *3.

Here, as in *Levitt*, key evidence about the "company from which [Microsoft] purchased the list of numbers," Pl. Memo 22, is no longer available and common issues do not predominate. But even more problematic, the key witness who could explain how C&S obtained consent is dead. Richmond Decl. ¶¶3, 9. As in *Blitz* and *A Aventura*, Microsoft presented evidence its customers asked to be contacted about Xbox by text message, and "some of those may be among the [91,708] numbers." *A Aventura*, 2013 WL 2243972, at *9. As in *Bridging Cmtys*, whether C&S or its marketing partners obtained consent "does not foreclose the possibility that some of" the proposed class members gave their consent directly to Microsoft. 2013 WL 2417939, at *3. And by May 2008, four months before the campaign, more than 25,000 people accepted Microsoft's invitation to receive text messages from Xbox. TWM Decl. ¶11, Ex. 9 (MS1302). Customers also consented to "receive game and insider Xbox updates as messages on my cell phone," when registering for Xbox.com. *Id.* ¶6, Ex. 4 (MS1206). From July 2007 through 2008

alone, Microsoft added over one million registrants to Xbox.com. *Id.* ¶8, Ex. 6 (MS1291).

The individual question whether a phone number could receive a text message in 2008, Microsoft's evidence of consent, and the unavailability of the sources of C&S's database defeat Smith's argument because "a classwide proceeding [will not] generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 255; *see also Hartman v. United Bank Card Inc.*, 2012 WL 4758052, at *12 (W.D. Wash. Oct. 4, 2012) (recognizing "the advent and rapid spread of technology" rendering telephone numbers portable precludes commonality because individualized hearings for each number would be necessary to address potential "defenses to the individual claims of each potential class member"). For the same reasons Plaintiff has not proved commonality, he failed to show that common questions and answers will predominate.

Similarly, because individual proof whether (1) a number on m-Qube's list could receive a text in 2008; (2) the current subscriber to the number on m-Qube's list is the same as in 2008; and (3) the subscriber in 2008 gave consent to C&S, its partners, or Microsoft, class treatment is not the superior method of adjudication. *See Vigus*, 274 F.R.D. at 238 (certification "would burden the Court and the litigants with the arduous task of sifting through each putative class member's claim to determine its merits on a case-by-case basis. This is unacceptable, especially where putative class members who were actually aggrieved … have a quick, adequate and superior remedy in other more speedy venues such as, for example, a state small claims court."); *Gannon v. Network Tel. Serv., Inc.*, 2013 WL 2450199, at *4 (C.D. Cal. June 5, 2013) (where predominance not met, "a class action would not be superior to other methods for fairly and efficiently adjudicating the controversy"); *Forman*, 164 F.R.D. at 404-05 (TCPA "provide[s] adequate incentive for an individual plaintiff to bring suit on his own behalf.").

///

### c. Individual Issues of Article III Standing Require Individual Inquiry.

Smith agrees he suffered no actual harm. His purported Article III standing rests on the TCPA's statutory damages provision. Congress enacted the TCPA to prevent "[u]nrestricted telemarketing," which "can be an intrusive invasion of privacy." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) (quotation marks and citation omitted). Congress wanted to prevent businesses from shifting advertising costs to consumers by forcing them to pay for ink, paper, or the cost of a telephone call. S. Rep. No. 102-178, at 1-2 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1968. It cited serious consumer complaints, including tying up telephone lines and preventing emergency calls, crowding other messages out of answering machines, and imposing costs on the called party. *Id.* at 2.

But Smith did not testify ████████████████████████████████████ ████████████. *Id.* at 61:7-62:20. ████████████████████████████ ████████████████████████████████████████████████████████. TWM Decl. ¶3, Ex. 1 at 56:17-57:12. ████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████." *Id.* at 60:6-20*; see Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147-48 (2013) (the mere risk of possible future injury does not confer Article III standing; standing requires "that threatened injury must be certainly impending") (quotation marks and citation omitted).

The Supreme Court has not decided whether Congress may create Article III standing by granting the right to sue for a statutory sum to a person who has no actual injury. But a June 2013 decision shows some Justices believe "astronomical" damages in statutory damage cases may violate constitutional limits. *Maracich v. Spears*, 131 S. Ct. 2191, 2209 (2013); *see also id.* at 2213

(Ginsberg, J. dissenting); *Fid. Fed. Bank & Trust v. Kehoe*, 547 U.S. 1051, 1051 (2006) (Scalia, J. concurring) (recognizing the "enormous potential liability, which turns on a question of federal statutory interpretation, is a strong factor in deciding whether to grant *certiorari*," and may make review appropriate). If the Court rules Congress has no such power, individual issues will predominate in weeding out persons like Plaintiff who suffered no harm, because a court may certify a class only if all members incurred injury to give them standing to bring their own claims. *Mazza*, 666 F.3d at 594.

### 2. The Proposed Class is Unascertainble.

Smith seeks certification of a class of "[a]ll individuals ***that received*** a text message … ," and insists m-Qube's list identifies those people. Pl. Memo 7 (emphasis added). Not so. ***First***, at least 24% of the phone numbers could not get texts, and merely looking at m-Qube's list cannot resolve who "received" the text message. ***Second***, the list may "include[] a substantial number of people who voluntarily gave their telephone numbers to [Microsoft] knowing [it] would call those numbers to present special commercial offers." *See Vigus*, 274 F.R.D. at 235. ***Third***, many of the current subscribers to the phone numbers in m-Qube's nearly five-year-old list are not the subscribers who "received" the text in 2008. Kaslofsky Decl. ¶¶11-13. ***Fourth***, at least 25% of the numbers are disconnected or no longer in service. Rifkin Decl. ¶¶8-9.

The purpose of the ascertainability requirement is three-fold. First, the inability to easily identify class members imposes "serious administrative burdens that are incongruous with the efficiencies expected in a class action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (quotation marks and citation omitted). Next, "it protects absent class members by facilitating the best notice practicable." *Id.* (quotation marks and citation omitted). Finally, "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Id.* (quotation marks and citations omitted).

In *Marcus*, the court recognized "where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." *Id.* (citing cases). The records there could not show whether a person was a class member, "rais[ing] serious ascertainability issues." *Id.* On remand, the court instructed the district court "against approving a method that would amount to no more than ascertaining by potential class members' say so," including by submitting affidavits, because that "may not be 'proper or just.'" *Id.* at 594 (quoting *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089-90 (N.D. Cal. 2011) (affidavits dependent upon proposed class members' subjective memories are "unreliable" and render class unascertainable because they do not rely on objective data)). Defendants can examine a named plaintiff at trial, but forcing them "to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications." *Id.*

Here the evidence shows many of the numbers on m-Qube's list could not receive a text, belonged to subscribers who consented to receive calls or text messages directly from Microsoft, are no longer used by the subscriber who "received" the text in 2008, or are disconnected. Kaslofsky Decl. ¶¶10-13; Rifkin Decl. ¶¶6-9. Microsoft can cross-examine Smith about these issues, but should not have to rely on others' affidavits—even if gathering tens of thousands were feasible; *see also Vigus*, 274 F.R.D. at 236 (recognizing "it would be necessary to identify the people assigned to those numbers at the times the ... calls were made, which may not be the people currently assigned to those numbers."); *Jamison v. First Credit Servs.*, 2013 WL 1248306, at *14 (N.D. Ill Mar. 28, 2013) (same).[10]

---

[10] Unlike in *Jamison*, where the court concluded it could subpoena carriers to determine whether 456 numbers were cell phones, here, subpoenas are necessary for 91,702 numbers, an "inquiry ... so daunting as to make the class definition insufficient." 2013 WL 1248306, at *16. The lack of an administratively feasible way to identify who "received" the text message without calling each number also differentiates this case from *Agne v. Papa John's Intl, Inc.*, 286 F.R.D. 559, 571-72

Continued...

The only way to identify "individuals that received" the text message is to call every number on m-Qube's list and talk to the current subscriber, but when no one answers or the person got the number after 2008, individual research of each number is required to try to find the 2008 subscriber. Kaslofsky Decl. ¶¶9-12; Rifkin Decl. ¶¶6-9. "If class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate." *Marcus*, 687 F.3d at 593.

### B. Smith and His Attorneys Will Inadequately Protect the Class's Interests and Smith's Delay Makes Him Atypical.

The representative plaintiff must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *Mazur*, 257 F.R.D. at 569. Smith and his attorneys' unreasonable delay in filing suit make them inadequate representatives because it creates "conflicts of interest with other class members." *Id.*

"Laches is an equitable defense that prevents a plaintiff, who with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (quotation marks omitted). "To demonstrate laches, the defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Id.* at 951 (quotation marks and citation omitted). Although rare, laches may bar a statutorily timely claim. *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1039 (9th Cir. 2000); *Danjaq*, 263 F.3d at 954; *New Era Publ'n Intern., ApS v. Henry Holt and Co., Inc.*, 873 F.2d 576, 585 (2d Cir. 1989) (two-year delay, combined with "severe prejudice," supports laches).

///

///

----

....Continued
(W.D. Wash. 2012). There, the evidence showed that a particular carrier failed to deliver all of the text messages to its customers. Excluding class members "whose numbers are associated with that carrier" could resolve the problem. *Id.*

### 1. Smith and His Attorneys Unreasonably Delayed

Smith delayed in initiating the suit for nearly three years even though ████ ██████████████████████████████████████████████. TWM Decl. ¶ 3, Ex. 1 at 75:14-17. ██████████████████████████████████, *id.* at 38:21-40:7, ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████," *id.* at 99:23-103:5. ████████████████████████████ ██████████████████████████████████. *Id.* at 13:1-16; 64:17-22. ████ ████████████████████████████████████████████████████████████████ ██████. *Id.* at 75:14-76:5; *see Internet Specialties West, Inc. v. Milon-Digiorgio Enter., Inc.*, 559 F.3d 985, 990 (9th Cir. 2009) (the relevant delay is from when plaintiff knew or should have known of the potential claim).

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████.

His attorneys regularly bring TCPA claims and needed only a short time here to do little more than change the name and date on earlier TCPA complaints. *See* Pl. Memo 19; Declaration of Michael McMorrow, Doc. 34-5, ¶ 2; Declaration of Evan M. Meyers, Doc. 34-3, ¶ 12; *Lee v. Stonebridge Life Ins. Co.*, No. 3:11-cv-00043-RS (N.D. Cal) (Complaint filed Jan. 4, 2011) (RJN, Ex. 2); *Danjaq*, 263 F.3d at 954 (delay is reasonable "when it is used to evaluate and prepare a complicated claim").

### 2. Microsoft Suffered Evidentiary Prejudice

"Though both laches and statutes of limitations may give defendants repose, laches, unlike a statute of limitations, is premised on a showing of prejudice." *Jackson v. Axton*, 25 F.3d 884, 888 (9th Cir.1994), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). "The very purpose of laches as an equitable doctrine—and the reason that it differs from a statute of limitations—is that the claim is barred because the plaintiff's delay occasioned the defendant's

prejudice." *Danjaq*, 263 F.3d at 954 (citation omitted). "'[L]aches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or parties.'" *Id.* (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)).

"Prejudice typically means that evidence is no longer available or that the party asserting laches has altered its [behavior] in reliance on a plaintiff's inaction." *Lyon v. Gila River Indian Community*, 626 F.3d 1059, 1076 (9th Cir. 2010) (quotation marks and citation omitted); *see also Danjaq*, 263 F.3d at 955. Evidentiary prejudice exists where evidence is "lost, stale or degraded," or witnesses' memories faded, or witnesses died. *Danjaq*, 263 F.3d at 955 (citations omitted); *see also Saul Zaentz Co. v.Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1118 (N.D. Cal. 2008) (prejudice exists where passage of time prevents use of records and defendant could not obtain "potentially important information" from deceased witness). In *Danjaq*, key witness deaths and the loss of records was prejudicial. The court rejected the argument that "there are some witnesses (other than the deceased ones) who can testify, and … the case depends primarily on a comparison of the written sources, rather than on live testimony," because "the inquiry is not whether *some* witnesses might be available—it is whether the absence of *other* witnesses … will prejudice Danjaq." *Id.* at 956 (citing *Jackson*, 25 F.3d at 890). Because the witness who was "the best source for information" died, "[t]hat there are a few survivors to tell part of the story does nothing to erase the prejudice caused by the unavailability of most of the key players." *Id.*

Microsoft suffered evidentiary prejudice as a result of the nearly three-year delay because key records—C&S's database and evidence of consent, and the 25,000 who gave consent directly to Microsoft—are no longer available. And Fuchs, the only person who knew the source of C&S's numbers, died before Microsoft could interview him.

### 3. Smith's Delay Makes Him Atypical of the Other Proposed Class Members

Rule 23(a)(3) requires the claims and defenses of the representative plaintiff be typical of the claims and defenses of the class. *Dukes*, 131 S. Ct.at 2550; *Gormley v. Nike Inc.*, 2013 WL 322538, at *8 (N.D. Cal. Jan. 28, 2013). Where a plaintiff "could be subject to unique defenses," he is atypical. *Mazur*, 257 F.R.D. at 568. The *Mazur* court recognized it "need not … determine the merits of these defenses, the fact that [plaintiff] may be subject to these defenses at all puts her in a different position than the rest of the putative class." *Id.* at 568-69; *see also Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 459 (N.D. Ill. 2013) (representative "is inadequate if she is subject to 'even an arguable defense' not applicable to the class as a whole") (quotation marks and citation omitted). As in *Mazur*, the Court need not determine now whether Microsoft will prevail on its defense as to Smith; "that [Smith] may be subject to [this] defense[] at all puts [him] in a different position than the rest of the putative class." *Id.*

### C. Smith is an Inadequate Class Representative Because He Does Not Know His Attorneys, What the TPCA is, Where His Attorneys Filed the Case, or What Relief His Complaint Seeks.

Smith is an inadequate class representative because he has "little or no supervisory role in the litigation and little knowledge of the underlying facts of the law suit." *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 612 (S.D. Cal. 2007) (quotation marks and citation omitted). ███████████

███████████████████████████████████████████

███████████████████████████████████████████.

TWM Decl. ¶ 3, Ex. 1 at 65:21-66:6, 69:3-5, 79:9-20; *see McPhail*, 247 F.R.D. at 612 (class representative inadequate when she did not recall seeing the complaint and did not recognize the names of her attorneys). ███████████

███████████████████████████████████████████

███████████████████████ *Id.* at 76:18-77:19; 79:1-80-4. ████

███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ." *Id.* at 68:11-13. ████████████████████████

████████████████████████████████ *Id.* at 95:14-16.

Smith ████████████████████████████████████████

████████████████████████████████ . *Id.* at 42:7-12. And although his Complaint

seeks statutory and treble damages, ████████████████████████

████████████████████████████████████████████████████████████

*id.* at 97:11-17. But a proposed representative is inadequate where "he does not

want his money back for the product he purchased" yet seeks restitution on behalf

of the class. *Minkler v. Kramer Laboratories*, 2013 WL 3185552, at *5 (C.D. Cal.

Mar. 1, 2013); *see also Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141

F.R.D. 144, 153 (N.D. Cal. 1991) ("a party who is not familiar with basic elements

of its claim is not … an adequate representative.").

## IV. <u>CONCLUSION</u>

A rigorous analysis of Smith's claims shows a class cannot be certified.

Individual issues of whether a phone on m-Qube's list could receive a text

message, identifying the subscribers in 2008, and proving whether they gave

consent to C&S, its marketing partners, or Microsoft, preclude certification. And

Smith and his attorneys' unreasonable delay prejudiced Microsoft on the

fundamental issue of consent. Finally, Smith knows little about the case and does

not want the primary relief his attorneys seek, making him unfit to represent the

proposed class. Microsoft respectfully asks that the Court deny Smith's motion.


Dated: July 11, 2013                    BALLARD SPAHR LLP


By:   /s/ Thomas W. McNamara
      Thomas W. McNamara
      Attorney for Defendant Microsoft
      Corporation