David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
(818) 990-1299 (phone)
(818) 501-7852 (facsimile)

Michael J. McMorrow (admitted *pro hac vice*)
mike@mjmcmorrow.com
MCMORROW LAW, P.C.
One North LaSalle St., 44th Floor
Chicago, IL 60604
Tel: (312) 265-0708

*Counsel for Plaintiff NEIL SMITH
and the putative class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL SMITH, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 11-cv-01958-JLS-BGS<br><br>CLASS ACTION<br><br>**PLAINTIFF NEIL SMITH'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. Janis L. Sammartino<br>Hearing Date: November 7, 2013 at 1:30 pm<br>Place: Courtroom 4A |

# **TABLE OF CONTENTS**

ARGUMENT ...................................................................................2

I.  The Proposed Class is Ascertainable and Meets  Rule 23's
    Requirements of Commonality, Predominance and Superiority ..........2

    a.  The Proposed Class Consists of Only Wireless
        Subscribers Who Could Receive Text Messages ......................2

    b.  Microsoft's Purported Evidence of Consent is Irrelevant
        and Inadmissible ..........................................................4

        1.  The Owen Gregory Declaration ......................................4

        2.  The Theoretical Xbox Opt-In List ...................................6

        3.  The Theoretical Come & Stay Opt-In Database .............8

    c.  Microsoft's Other Arguments for Individualized Inquiry
        are Red Herrings ..........................................................11

II. Neil Smith Meets the Requirements of Typicality and
    Adequacy .........................................................................12

    a.  Microsoft's Laches Argument is Unavailing............................12

    b.  Neil Smith and His Attorneys Will Adequately Represent
        the Class ...................................................................17

CONCLUSION ............................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A Aventura Chiro. Ctr., Inc. v. Medical Waste Mgt., LLC*
2013 WL 2243972 (S.D. Fla. May 21, 2013) ......................................................7

*A Aventura Chiro. Ctr., Inc. v. Medical Waste Mgt., LLC*
2013 WL 3463489 (S.D. Fla. July 3, 2013) .......................................................7

*Bridging Communities, Inc. v. Top Flite Financial, Inc.*
2013 WL 2417939 (E.D. Mich. June 3, 2013) ....................................................8

*Cornetta v. U.S.*
851 F.2d 1372 (Fed. Cir. 1988) ....................................................................13

*Danjaq LLC v. Sony Corp.*
263 F.3d 942 (9th Cir. 2001) .......................................................................13

*Gagne v. Northwestern Nat'l Ins. Co.*
881 F.2d 309 (6th Cir. 1989) .........................................................................5

*Hartman v. United Bank Card, Inc.*
2012 WL 4758052 (W.D. Wash. Oct. 4, 2012) ..................................................8

*Jones v. R.R. Donnelly & Sons, Inc.*
541 U.S. 369 (2004)....................................................................................12

*Kling v. Hallmark Cards, Inc.*
225 F.3d 1030 (9th Cir. 2000) ......................................................................13

*Leavitt v. Fax.com*
No. 05-949, 2007 WL 316978 (D. Md. May 25, 2007) ........................................8

*Lee v. Stonebridge*
289 F.R.D. 292 (N.D. Cal. 2013)....................................................................7

*Love v. Commerce Bk. of St. Louis, N.A.*
37 F.3d 1295 (8th Cir. 1994) .........................................................................5

*Manno v. Healthcare Revenue Recovery Grp., LLC*
289 F.R.D. 674 (S.D. Fla. 2013).....................................................................3

*Meyer v. Portfolio Recovery Associates*
   707 F.3d 1036 (9th Cir. 2012) ...............................................6, 7, 8

*New Era Publ'n Intern., ApS v. Henry Holt and Co., Inc.*
   873 F.2d 576 (2d Cir. 1989) ...........................................................13

*Reno Air Racing Ass'n, Inc. v. McCord*
   452 F.3d 1126 (9th Cir. 2006) ......................................................13

*Sandvik v. Alaska Packers Ass'n*
   609 F.2d 969 (9th Cir. 1979) ....................................12, 14, 15, 16

*Satterfield v. Simon & Schuster, Inc.*
   569 F. 3d 946 (9th Cir. 2009) ....................................................9, 10

*Save the Peaks Coalition v. U.S. Forest Service*
   669 F.3d 1025 (9th Cir. 2012) ......................................................15

*Silbaugh v. Viking Magazine Services*
   278 F.R.D. 389 (N.D. Ohio 2012) ..................................................7

*U.S. E.E.O.C. v. Lockheed Martin Global Telecmm'n, Inc.*
   514 F. Supp. 2d 797 (D. Md. 2007) ..............................................14

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*
   274 F.R.D. 229 (S.D. Ill. 2011) ......................................................8

**OTHER CASES**

*Am. Home Services, Inc. v. A Fast Sign Co., Inc.*
   287 Ga. App. 161, 651 S.E.2d 119 (Ga. Ct. App. 2007) .....................7

*Blitz v. Agean, Inc.*
   __ S.E. 2d __, 2013 WL 2395970 (N.C. App. June 4, 2013).............8

**FEDERAL STATUTES**

28 U.S.C. § 1658 .............................................................................12

**OTHER AUTHORITIES**

Article III, U.S. Const. ..............................................................11, 12

Fed. R. Civ. Pro. 11 ........................................................................18

Fed. R. Civ. Pro. 23......................................................................................2

Fed. R. Civ. Pro. 23(b)(3) .........................................................................19

Fed. R. Evid. 602 ........................................................................................5

Before Microsoft decided to blast text messages advertisements to Neil Smith and the proposed Class in this matter, it already suspected that Come & Stay ("C&S"), who it hired to provide an "opt-in list" of cell phone subscribers, was lying about its list. One of Microsoft's other agents said ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████.

Despite the fact that it doubted C&S then, and despite the fact that C&S's claims were proven to be false, Microsoft now wants this Court to accept that C&S's lies to it constitute "evidence of consent." Microsoft wants this Court to believe that, if only Mr. Smith had filed his lawsuit sooner, C&S would be able to show the evidence of consent that Microsoft itself never sought and never saw. Microsoft wants this Court to imply some overlap between C&S's list and its own missing "list" of "opt-in" cell phone subscribers, despite no indication of such overlap. And at the same time that Microsoft asks this Court to find that the existence of C&S's "opt-in" list somehow satisfies its burden to demonstrate consent, Microsoft also asks this Court to find the proposed Class unascertainable because of the invalidity and inaccuracy of that very C&S list.

Microsoft's arguments fail. Determining which numbers on C&S's list were cellular phones when the messages were sent is simple, and has been done. None of the "evidence" that Microsoft puts forward creates individualized questions of consent. None of the "missing" documents would have affected the absence of consent. And Plaintiff's filing of this suit with over a year remaining in the

---

[1] See Decl. of Michael Richmond (Dkt. 46-6), Ex. 3, at ICONMOBILE000604.

limitations period has changed nothing, nor made him atypical of the proposed Class. The Class is ascertainable, cohesive, and presents only common questions. Class certification is proper.

## ARGUMENT

**I. The Proposed Class is Ascertainable and Meets Rule 23's Requirements of Commonality, Predominance and Superiority**

### a. The Proposed Class Consists of Only Wireless Subscribers Who Could Receive Text Messages

It has become apparent through discovery in this action that the 91,708 telephone numbers to which Microsoft sent the September 2008 text message were not solely wireless telephone numbers. Those phone numbers were contained in a list of numbers provided by Microsoft's agent, Come&Stay ("C&S"), and it has become obvious that this list was "not examined for accuracy by either Microsoft or its advertising agencies as nearly 37,000 of these telephone numbers were landline telephone numbers and, thus, could not receive mobile text messages." (*See* Supplemental Declaration of Randall Snyder ("Snyder Supp. Decl."), attached as **Exhibit A** hereto, ¶ 27.) Seeing the evidence that its agent misrepresented its "opt-in" list of wireless numbers, Microsoft now argues that the existence of landline numbers on that list make it impossible to determine without individual inquiry which numbers on that list were cellular phones which would, thus, be capable of receiving the text messages at issue here. (*See*, e.g, Def. Br. at 2, 3-4, 10, 12, 18.) Microsoft is wrong; determining which numbers were cellular numbers at the time of the text message transmission is simple, and has now been done. The existence of landline numbers on C&S's phone list cannot defeat class certification.

As a result of the inaccuracies in C&S's purported opt-in wireless phone list, Plaintiff and his expert witness engaged a third party vendor to compare, or "scrub," the C&S list of numbers to which the text messages were sent against a list of wireless phone numbers maintained by Neustar, Inc. and other authorities which own and operate an accurate and highly reliable nationwide real-time wireless number database. (*See* Affidavit of John T. Taylor, attached as **Exhibit B** hereto; Declaration of Evan M. Meyers ("Meyers Decl."), attached as **Exhibit C** hereto, ¶ 5; Snyder Supp. Decl. ¶¶ 9-17.) After scrubbing the C&S list against the Neustar database, it was determined that 55,123 of the 91,708 numbers were, in fact, cellular telephone numbers as of September 12, 2008. The list of those cellular phone numbers to which the September 12, 2008 text messages were sent is attached as Exhibit 3 to the Meyers Declaration (the "Neustar List").[2]

The wireless scrub eliminates the concern Microsoft raises regarding the ascertainability of the class. Microsoft posits that calling each number is the "only way to find out if the number in question could have received" the text message. (Def. Br. at 12-13.) As described above, however, each of the 55,123 numbers on the Neustar List was assigned to a cellular telephone service on September 12, 2008, and could receive text messages.[3] The use of a wireless "scrub" by CompliancePoint and Mr. Snyder, like the one here, was held to support class

---

[2] In an effort to show that the class is unascertainable, Microsoft submitted the declarations of nine individuals claiming that their phone numbers were assigned to landline phone service in September 2008. (Def. Br. at 3.) All of those numbers were among the landline numbers that were eliminated by the scrub—none of those numbers appears on the Neustar List. (Snyder Supp. Decl. ¶ 18.)

[3] Plaintiff does not need to, and does not now seek to redefine the proposed Class as defined in Plaintiff's opening brief. Rather, Plaintiff has described it more precisely—Plaintiff has now narrowed the proposed Class from 91,708 putative members to 55,123 members based on the same Class definition.

certification in other similar cases including *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684, n.3 (S.D. Fla. 2013), where Mr. Snyder similarly testified to the scrubbing of a list of phone numbers against a wireless number portability directory to remove the landline phones and determine that more than half of those numbers were wireless phones.

Microsoft's argument that the proposed Class cannot be ascertained without separately analyzing each phone number on the C&S list, and that such an inquiry defeats commonality, typicality and predominance, is meritless. The Neustar List, based on reliable and accurate nationwide carrier data, definitively establishes which numbers sent the text messages were cellular numbers. These proposed Class members have now been fully identified, and Microsoft's arguments as to commonality, typicality and predominance have been eliminated in one stroke. Class certification is appropriate.

### b. Microsoft's Purported Evidence of Consent is Irrelevant and Inadmissible

Microsoft contends that it has provided evidence that shows some of the Class members consented to receive the text messages at issue in this case. It has not. None of the purported evidence showing individualized questions of consent demonstrates that even a single member of the proposed Class consented to receive text messages from Microsoft, or even from C&S.

### 1. The Owen Gregory Declaration

The first piece of purported evidence is the Declaration of Owen Gregory. (Dkt. 46-22.) Mr. Gregory is a member of the proposed Class. His phone number appears on the Neustar List, and after being contacted directly by Microsoft in this litigation, he confirmed that his phone was a cellular phone in September 2008. Mr. Gregory states that he thinks "it is likely" that he consented to receive "that

type of text message." (Dkt. 46-22., ¶ 1.)  However, Mr. Gregory does <u>not</u> state that he actually gave such consent and even testifies that he does not recall the circumstances in which he might have provided such consent and that he does not even recall whether he received the text message at issue.  (Dkt. 46-22, ¶¶ 3-4.)

The purported evidence that Mr. Gregory consented to receive text messages from Microsoft is not evidence at all.  "A witness may testify to a matter only if evidence is introduced to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Gregory's Declaration demonstrates that he lacks such personal knowledge; his testimony lacks any probative value.  Gregory's vague statements that he does "not recall whether [he] received a promotional text message on [his] cell phone on September 12, 2008," that "there are a variety of places where [he] could have consented to receive advertising text messages" generally, that he "think[s] it is likely" that he did consent to receive "that type of text message," and that "[he] do[es] not now recall the circumstances" relating to any such consent demonstrate that he lacks personal knowledge of whether he consented or not.  (Dkt. 46-22, ¶¶ 3-4.)  Statements in a declaration are inadmissible unless the declaration itself affirmatively demonstrates that the declarant has personal knowledge of those facts.  *Love v. Commerce Bk. of St. Louis, N.A.*, 37 F.3d 1295, 1296 (8th Cir. 1994); *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 315-16 (6th Cir. 1989) (holding that statements in affidavits that are not based on personal knowledge and personal observation do not contain facts that are admissible evidence).  Mr. Gregory's Declaration demonstrates that he lacks such knowledge.[4]  It is not competent evidence, it is irrelevant, and it

_____

[4] Despite contacting over 1,300 people whose numbers appeared on the C&S list of 91,708 numbers, Microsoft cannot identify a single person who can say that he or she consented to receive this text message from Microsoft.

provides no support for Microsoft's affirmative defense of consent.

### 2. The Theoretical Xbox Opt-In List

The second piece of purported evidence put forward by Microsoft to suggest that Class members may have consented is an inference that some of the Class members may have been – hypothetically – on a list of consumers who opted-in to receive texts about Xbox. Microsoft claims that "evidence shows many may have given Microsoft consent to receive texts about Xbox." (Def. Br. at 5.) There is no such evidence. The "evidence" Microsoft points to is a declaration from one of its employees stating that, ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████ That declaration does <u>not</u> claim that the text messages at issue here were sent to any of those numbers. In fact, the evidence demonstrates that they were not. The phone numbers to which the text messages were sent came from C&S's database, not Microsoft's (*see* April 24, 2013 Declaration of Evan M. Meyers, Dkt. 34-3, Ex. 7 at 35 of 41), and there is no evidence – not even a suggestion – that Microsoft provided its own list to C&S for inclusion in the September 12, 2008 text message blast. Microsoft does not even possess this purported internal opt-in list – claiming that it must have lost it – and Microsoft puts forth no evidence to suggest that any of the numbers on its hypothetical list are actually members of the proposed Class.

Microsoft argues that the theoretical possibility of some overlap between its hypothetical list and the numbers on the Neustar List renders class certification inappropriate. But hypothetical arguments that some of the Class members "may have" given consent should be given no weight. In *Meyer v. Portfolio Recovery Associates*, 707 F.3d 1036 (9th Cir. 2012), the Ninth Circuit addressed the effect of a defendant presenting hypothetical arguments in the way Microsoft does here. In

*Meyer*, the defendant attempted to argue that prior express consent was an individualized issue because class members "might have agreed to be contacted at any telephone number" or class members' phone numbers may have "been obtained via skip-tracing," thus creating individualized issues. *Id.* at 1042. The Court rejected these arguments and upheld certification, stating that the defendant could not point to a "single instance" where express consent was given. *Id.*

Similarly, the court in *Lee v. Stonebridge*, 289 F.R.D. 292 (N.D. Cal. 2013), rejected the defendant's argument that the plaintiff "has not eliminated the possibility that the dialing list used here was generated, at least in part, from websites where individuals had consented to receiving [text] messages," and certified the class in that text message spam case under the TCPA. 298 F.R.D. at 295. Other courts have ruled similarly. *See Silbaugh v. Viking Magazine Services*, 278 F.R.D. 389, 394 (N.D. Ohio 2012) ("Having produced no evidence that any individual consented to receive text messages in response to plaintiff's presentation of [defendant's] testimony, defendant is unable to realistically argue that individual issues of consent outweigh commonality"); *see also Am. Home Services, Inc. v. A Fast Sign Co., Inc.*, 287 Ga. App. 161, 163, 651 S.E.2d 119, 121 (Ga. Ct. App. 2007) ("the trial court did not abuse its discretion in rejecting [defendant's] claim that the proposed class failed the commonality requirement based on the hypothetical existence of persons in the class against whom it could assert the existing business relationship exemption.")

It is the same here—Microsoft's unsupported argument that there "may be" some overlap between the wireless numbers on its missing list and the 55,123 numbers on the Neustar List makes little sense and is purely hypothetical.[5] It does

_____

[5] The cases relied upon by Microsoft do not support its argument. One of the cases, *A Aventura Chiro. Ctr., Inc. v. Medical Waste Mgt., LLC*, 2013 WL

not create individual issues.

### 3. The Theoretical Come & Stay Opt-In Database

The final piece of "evidence" upon which Microsoft attempts to rely is the purported "opt-in" database of C&S. Microsoft wants this Court to believe that C&S's records, if only they were still around, would demonstrate that some or all of the Class members in this case gave consent to C&S to receive the text

---

2243972 (S.D. Fla. May 21, 2013), has since been vacated, and the Court in that matter subsequently certified the TCPA class. *See A Aventura Chiro. Ctr., Inc. v. Medical Waste Mgt., LLC*, 2013 WL 3463489 (S.D. Fla. July 3, 2013). The other cases are factually and legally inapposite. In *Hartman v. United Bank Card, Inc.*, 2012 WL 4758052, at *12 (W.D. Wash. Oct. 4, 2012), the plaintiff's inability to determine which phones were located in the state of Washington, for claims based on that state's consumer protection statutes, defeated class certification. *Blitz v. Agean, Inc.*, __ S.E. 2d __, 2013 WL 2395970, at *5 (N.C. App. June 4, 2013), an appellate state Court case, has been appealed and review has been granted by the North Carolina Supreme Court. *See* 747 S.E.2d 546 (N.C. 2013). In *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229 (S.D. Ill. 2011), the court found that determining which numbers were "recycled" presented individual inquiries, and the court's rejection of class certification was because it was undisputed that the list of called numbers was created by the defendant and contained individuals who consented to be called by that specific defendant. *Id.* at 236-237. In fact, the *Vigus* court distinguished the facts in that case from a situation – like the instant case – where the defendant purchased a list of numbers from a third party, suggesting that in such a situation, it would be likely that the "great majority" of call recipients would have valid TCPA claims. *Id.* at 234-35. *Leavitt v. Fax.com* is also distinguishable. In that case, the court decertified a class after the fax transmission logs became unavailable and it became impossible to determine, for example, whether numbers were generated by "computers randomly dialing and hunting for fax machines . . . ." *Leavitt*, No. 05-949, 2007 WL 316978, at *4 (D. Md. May 25, 2007). The situation here is the exact opposite; Plaintiff has obtained the transmission logs in this case. Finally, *Bridging Communities, Inc. v. Top Flite Financial, Inc.*, 2013 WL 2417939, at *1 (E.D. Mich. June 3, 2013), a fax case, acknowledges that it is a dissenting view even within its own District. 2013 WL 2417939, at *3. Particularly in view of the Ninth Circuit's holding in *Meyer*, these cases hold no weight.

---

1   messages from Microsoft. But Microsoft itself doesn't even believe that C&S
2   obtained valid consent, producing evidence ████████████████████████████████
3   ████████████████████████████████████████████████████████████████████████████
4   ████████████████████████████████████████████████████████████████████████████
5   ████████████████████ and gratuitously suggesting in its brief that C&S may have
6   "misrepresented its database as opt-in." (Def. Br. at 14.)

7        There are good reasons for Microsoft's skepticism. Its due diligence in
8   ensuring the legal compliance of its text message blast consisted of ███████████
9   ████████████████████████████████████████████████████████████████████████████
10  ████████████████████████████████████████████████████████████████████████████
11  ████████████████████████████████████████████████████████████████████████████
12  ████████████████████████████████████████████████████████████████████████████
13  ████" (Def. Br. at 6.) The evidence Microsoft puts forward demonstrates that
14  ████████████████████████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████████████████████████
16  ████████████████████." (Dkt. 46-6, ¶ 10.)[6] There is no evidence that either Microsoft or
17  any of its agents ever did anything to even look at, much less actually verify, how
18  the individuals in C&S's database "opted in" and whether or how such "opt ins"
19  for ringtones and horoscopes actually included express consent to receive future
20  text messages from Microsoft. Taking all the "evidence" Microsoft puts forward
21  about C&S, any "consent" was ████████████████████████████████████████████████

22  ────────────────────
      [6] Snyder notes that the industry practice at the time was for such "opt-ins"
23  harvested by lead generators such as C&S to be for the receipt of text messages
    from the mobile content provider itself or from its brands and affiliates—not
24  consent to receive any text message from any unknown entity at any time in the
    future. (*Id.*, ¶¶ 19-26, 36.) Mr. Snyder also served as an expert witness in
25  *Satterfield v. Simon & Schuster, Inc.,* 569 F. 3d 946 (9th Cir. 2009), which found
26  such purported consent lacking. (*Id.*, ¶ 26.)

27

28

████████████████████████████████████████████████

████████████████████████████████████████████████

████████. There was good reason for ████████ to warn Microsoft that ████

████████████████████████" (Dkt. 46-6, Ex. 3 at Iconmobile000604.)

Essentially, Microsoft is arguing that a bare representation of compliance from a company it had never done business with before (and from an individual, Mr. Richmond who admittedly had no personal knowledge of the company's opt-in procedures),[7] made to an employee of one of its subcontractors, is evidence that the numbers in that database had given consent for Microsoft to send text message advertisements. (*See* Def. Br. at 14, n.8 (claiming that Iconmobile's "investigation" of C&S distinguishes this case because the defendants in those cases "took no steps to verify consent.") The argument is ludicrous.

As the Ninth Circuit found in *Satterfield v. Simon & Schuster, Inc.*, "prior express consent" under the TCPA is required to send text message advertisements to a consumer, meaning "consent that is clearly and unmistakably stated." 569 F.3d at 955. The defendant in that case, similar to here, sought to "transfer" consent from an unrelated company to itself, even though the record showed "no direct contractual relationship" between the unrelated company and the defendant. *Id*. The Court rejected the argument, stating that the plaintiff's "consent to receive promotional material by [third-party] Nextones and its affiliates and brands cannot be read as consent to the receipt of [the defendant's] promotional material." *Id*.

---

[7] *See* Richmond Decl, Dkt. 46-6, ¶¶ 3-4 (stating that ████████████

████████████████.) In fact, Microsoft attempted to do business with C&S once before, but C&S "████████████████

████████████." (Meyers Decl., Ex. 2.)

Even if Microsoft had sought evidence of prior express consent from C&S (which it did not), such consent would not have extended to Microsoft. Microsoft had no relationship with the people purportedly "opting in." Microsoft had never before done business with C&S, much less the unknown third-parties from whom C&S obtained its numbers, and the purported "opt-ins" – for ringtones and horoscopes – had nothing to do with Microsoft.

But Microsoft doesn't really believe that C&S had a legitimate opt-in database, it doesn't really believe that there is any real chance of overlap between its own missing opt-in list and the Neustar List, and it doesn't really believe that Mr. Gregory gave Microsoft consent to send him text messages. It makes these arguments only to raise *theoretical* issues of consent, and to mask Microsoft's real problem in this case: there is simply no evidence of consent whatsoever.

### c. Microsoft's Other Arguments for Individualized Inquiry are Red Herrings

Microsoft raises several other arguments that contend individual inquiries are required. It claims that the phone numbers in question "may belong to a different subscriber now than in September 2008 [or] may be disconnected." (Def. Br. at 13.) Although true, this fact is not an impediment to class certification. The Class members are the persons who subscribed in September 2008; although most will be the current subscriber, the fact that some are no longer the subscriber to whom the number was assigned is of no moment. The identities of the account holders as of September 12, 2008 can be obtained from the wireless carriers themselves. (Snyder Suppl. Decl., ¶¶ 28-36). And in the unlikely event that one or more of the carriers no longer maintains such information, that information can be readily and accurately obtained by commercial providers. (*Id.*)

Microsoft's argument that issues of Article III standing require individual

inquiry also fails. Microsoft argues that Plaintiff agrees he suffered no actual harm and that Plaintiff "did not testify the text invaded his privacy." (Def. Br. at 18.) This is untrue. Microsoft never asked Mr. Smith whether the text invaded his privacy, and Smith testified that the text caused him harm. (Meyers Decl., Ex. 1, Tr. at 60:2-20.) This Court has already resolved the issue of standing for Mr. Smith and the other Class members in this case. Denying Microsoft's Motion to Dismiss, this Court ruled that "by alleging he received a text message in violation of the TCPA, Smith has established a particularized injury premised on the invasion of his privacy, even absent economic harm." (Dkt. 15, Order at 9.) And the Court noted that Smith alleged the unwanted invasion of his private property and the economic injury resulting from paying his wireless carrier "in some way" to receive text messages. (*Id*. at 5.)

Finally, the argument about hypothetical future Supreme Court action raised by Microsoft is not an Article III standing question; it is a due process question raised in the dissent of that opinion only. (*See* Def. Br. at 18, *citing Maracich v. Spears*, 131 S. Ct. 2191, 2209 (2013)). But speculation that the Supreme Court may invalidate the TCPA in the future is no basis to deny certification. Moreover, such a hypothetical ruling would apply equally to the entire proposed Class, and not only to Plaintiff; even such a ruling would not defeat class certification here.

## II.  Neil Smith Meets the Requirements of Typicality and Adequacy

### a. Microsoft's Laches Argument is Unavailing

Microsoft provides no basis for the Court to conclude that the timing of Neil Smith filing this suit was unreasonable or resulted in any substantial prejudice; its laches argument fails. The Complaint was filed with more than a year remaining in the four-year limitations period. *See* 28 U.S.C. § 1658; *Jones v. R.R. Donnelly & Sons, Inc.*, 541 U.S. 369, 382 (2004)). Courts presume that the timing of filing

is reasonable if the Complaint is filed within the statute of limitations. *See Sandvik v. Alaska Packers Ass'n*, 609 F.2d 969, 972, 974 (9th Cir. 1979) (finding it doubtful that laches could be invoked when suit was brought three years into the relevant six year statute of limitations); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1138  (9th Cir. 2006) (finding a "strong presumption" against laches when limitations period was six years and plaintiff filed suit three years after becoming aware of his claim) (citing *Shouse v. Pierce County*, 559 F.2d 1142, 1147 (9th Cir. 1977)) ("It is extremely rare for laches to be effectively invoked when a plaintiff has filed his action before limitations … has run"); *Cornetta v. U.S.*, 851 F.2d 1372, 1376 (Fed. Cir. 1988) (finding laches traditionally "unavailable in actions at law brought within the applicable statute of limitations.") The timing of Plaintiff's suit was presumptively reasonable.[8]

Nonetheless, Microsoft raises three "examples" of evidentiary prejudice it suffered as a result of Smith waiting until August 2011 to file his Complaint: (1) the destruction of evidence in the files of C&S; (2) the death of Robert Fuchs, a

---

[8]  The cases Microsoft cites to suggest that laches should apply even during the limitations period are unavailing.  All three deal with copyright infringement.  In the first, *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001), the plaintiff delayed 20 years on some claims and 35 years on others.  In the second, *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1039 (9th Cir. 2000), the Court *rejected* a laches defense after a three year delay in filing suit, noting with approval the general standard that laches should generally not apply if the suit is filed within the statutory limitations period.  *See Id*. at 1041, n.8.  In the third, *New Era Publ'n Intern., ApS v. Henry Holt and Co., Inc.*, 873 F.2d 576 (2d Cir. 1989), the delay did not involve *evidentiary* prejudice as Microsoft claims here, but prejudice from the change in legal position where the publisher was aware that an infringing book was being published, but took no steps to file suit until over a year *after* publication. *Id*. at 584.  The court applied laches because the plaintiff was aware of the infringement *prior to* publication and could have, but did not, take pre-publication action that would have minimized any infringement (and costs) before publication.

C&S employee, four months after the suit was filed; and (3) the purported disappearance of a list of phone numbers which supposedly consented to receive text messages from Microsoft promoting Xbox products. None of these events is attributable to any delay in filing by Neil Smith. The destruction of C&S's files occurred in 2009, as the company closed its U.S. operations two months after the text message blast at issue here. The death of Mr. Fuchs occurred four months after the Complaint was filed and is therefore irrelevant to a laches analysis. Finally, Microsoft's failure to preserve its own electronic files, while ironic, is neither the fault of Plaintiff's delay, nor is it relevant, as Microsoft did not send the text messages to those numbers. Microsoft's laches argument is a red herring.

A defendant asserting laches has to prove that any lost evidence was the result of Plaintiff's unreasonable delay, that any such lost evidence would ultimately support its position, and that defendant "has been crippled in its ability to succeed on the merits at trial." *U.S. E.E.O.C. v. Lockheed Martin Global Telecmm'n, Inc.*, 514 F. Supp. 2d 797, 803-04 (D. Md. 2007) (quotations and citations omitted). Microsoft has not come close to meeting this burden.

Microsoft's first assertion of prejudice – that files from C&S were gone by the time it "immediately" investigated the Complaint – is unavailing. As former C&S employee Michael Richmond testifies, in November 2008, the CEO of C&S's corporate parent "flew to the U.S. and fired Richmond and other U.S employees; in 2009, she closed C&S's U.S. office, and its records disappeared." (Def. Br. at 9.) The fact that those records are no longer available has nothing to do with any "delay" in Plaintiff's filing of his lawsuit—they disappeared very shortly after the text messages were sent. *See Sandvik*, 609 F.2d at 973 (where evidentiary loss "occurs before any unreasonable delay, the [evidentiary loss] should not be used as a basis for the application of the doctrine of laches.")

Furthermore, Microsoft made no attempt to obtain these documents until July 2012 – almost a year after the lawsuit was filed – when it hired a French law firm to attempt to obtain these records from C&S's corporate parent. (Def. Br. at 9.)

Microsoft's second assertion of evidentiary prejudice stems from the death of former C&S employee Robert Fuchs in December 2011. Mr. Fuchs died four months <u>after</u> this lawsuit was filed. This fact alone defeats application of laches. *See Save the Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025, 1033 (9th Cir. 2012) (finding that prejudice must be judged as of the time the lawsuit is filed, and that courts should disregard events subsequent to filing the lawsuit, citing *Cornetta*, 851 F.2d at 1386 ("The period after the filing of the suit cannot be relevant to the prejudice inquiry since the laches determination only focuses on the time and events taking place until suit is filed.")) Microsoft knew, or should have known, of C&S's involvement in the text message spam at issue when the suit was filed. (*See, e.g.,* Richmond Decl., Dkt. 46-6, Ex. 3 (showing communications with Microsoft employees relating to C&S's involvement.)) Yet, Microsoft did not even attempt to reach out to Mr. Fuchs. The fact that Microsoft failed to reach out to its agents whose work caused the suit is not the fault of Neil Smith. *See Sandvik*, 609 F.2d at 973 (stating that if a witness' death occurs after the filing of the lawsuit, then the court should consider whether defendant failed to properly preserve evidence, and that a plaintiff "should not suffer because his adversaries have not preserved defense material.").[9]

---

[9] Finally, the loss of Mr. Fuchs' testimony in this case cannot be prejudicial, because it could be of no benefit to Microsoft in this case. Even if Mr. Fuchs would testify as to everything Microsoft claims – particularly whether and how the members of C&S's database opted-in to receive text messages – such testimony would be insufficient. As discussed in § I(b)(3), above, even if this Court were to accept that the September 2008 Xbox text message was sent to individuals who existed in C&S's "opt-in" database because they had previously opted-in to receive

Microsoft also alleges that Plaintiff's "unreasonable delay" in filing suit somehow resulted in Microsoft being unable to access its own records relating to consent. (Def. Br. at 5, 23.) This assertion is absurd. Assuming that Microsoft somehow lost its own computer records, the fault for this loss is not Neil Smith's. Microsoft provides no explanation for what files or records were searched or when they were searched, and there is no evidence relating to where this data existed such that it would now be untraceable. Importantly, there is no evidence whatsoever as to when these files might have been lost and there is, thus, no reason to believe that the files weren't lost *prior to* the September 2008 text spamming event at issue here, or sometime shortly thereafter, or even sometime after the lawsuit was filed.[10] Without this information, even the curious claim that Microsoft destroyed its own opt-in list cannot support a finding of prejudice. *See Sandik*, 609 F.2d at 973 ("Without knowing the dates of the [evidentiary loss], it is impossible to determine whether any prejudice was caused by the delay. Where [evidentiary loss] occurs before any unreasonable delay, the [loss] should not be used as a basis for the application of the doctrine of laches.")

Moreover, there is no evidence that the missing list has anything to do with this case. Microsoft did not send the text messages to its own purported list. Rather, Microsoft sent the messages to numbers culled from C&S's database, more than a third of which were not even wireless numbers. As discussed in § I(b)(2), above, the hypothetical possibility that one of the numbers on Microsoft's list

---

future text messages in exchange for receiving ████████████████████████ ██████████, that does not mean that any of those individuals provided the necessary prior express consent to receive text messages from Microsoft.

[10] Even if Microsoft shared the data with Wunderman, as it suggests (*see* Dkt. 46-8, ¶ 8), it does not indicate whether Wunderman still has the data, whether it asked Wunderman to search for it, or whether Wunderman also lost the data.

overlapped with the numbers on C&S's list falls far short of "substantial prejudice."

As a final matter, Neil Smith's "delay" in filing this suit does not render him atypical of the Class. Microsoft asserts that because a plaintiff "who could be subject to unique defenses" is atypical, the possibility of a laches defense against Mr. Smith renders him atypical. (Def. Br. at 24.) But Microsoft could raise the same argument against any other potential Class member, all of whom were sent the same text message and none of whom filed suit before Neil Smith did. The potential laches defense, if cognizable at all, is not unique to Mr. Smith.

### b. Neil Smith and His Attorneys Will Adequately Represent the Class

The final volley in Microsoft's barrage of arguments against class certification is its claim that Neil Smith is an inadequate representative. (Def. Br. at 24-25.) Microsoft raises a number of misleading quotes[11] to suggest that Mr. Smith is an inadequate representative, but he is actually an ideal representative of the Class. Mr. Smith invested his own time in this case from the very beginning. He reviewed the Complaint before it was filed, because " █████████████████████ █████████████████████████████ (Meyers Decl., Ex. 1, Tr. at 45:15 - 46:25.) He helped prepare the Complaint by ████████████████████████████████ ███████████████████████████. (*Id*., Tr. at 45:15 – 47:11, 94:9-17.) Mr. Smith has prepared written testimony in support of this class

---

[11] As an example, Microsoft claims that Mr. Smith ████████████████ ███████████████████████████████████████████████████████████ " (Def. Br. at 24). But Mr. Smith did not ████████████████████████ ████████████████████████████. (Meyers Decl., ¶ 6.) And the fact that Mr. Smith is ████████████████████ is immaterial to his qualifications to represent the proposed Class.

certification Motion, has responded to written discovery from Microsoft, and sat for a deposition in connection with this litigation.

Furthermore, the fact that Mr. Smith's primary motivation in bringing this suit is ███████████████████████████████████████████████████████ ███████████████████████████████████" (*Id.*, Tr. at 97:18-21) negates Microsoft's purported "gotcha" that he supposedly ██████████████ ███████████████████████████ (*See* Def. Br. at 25.) Mr. Smith's attempt to show purity of motive in a deposition does not alter the fact that he has demanded recovery of the damages available under the TCPA, and Mr. Smith never testified that ██████████████████████████████████████████████████████████ ██████ Mr. Smith may not have any legal background, but he has demanded recovery in damages under the TCPA for himself and the Class (*see* Compl. at 6-7), and continues to demand it. The suggestion that Mr. Smith cannot adequately represent the interests of the Class is baseless.

Smith's counsel will also adequately protect the interests of the Class. Microsoft suggests that the delay in filing suit renders his attorneys inadequate counsel, and suggests that his attorneys "needed only a short time here to do little more than change the name and date on earlier TCPA complaints." (Def. Br. at 22.) Microsoft's argument is a baseless attempt to impugn counsel. Any purported "delay" in filing suit did not substantially prejudice Microsoft (*see* § II(a), above); moreover, the demands of Rule 11 dictate that the investigation and filing of a TCPA class action involves significantly more than "changing the name and date" on pleadings; the law neither requires nor permits suits to be filed immediately at the expense of adequate investigation. Furthermore, proposed class counsel have repeatedly been found competent and adequate counsel in class actions such as this one. (*See* April 24, 2013 Declaration of Evan M. Meyers., Dkt. 34-3, ¶¶ 10-13;

April 24, 2013 Declaration of Michael J. McMorrow, Dkt. 34-5, ¶¶ 2-5.)

## **CONCLUSION**

For the reasons discussed above and in his Motion for Class Certification, Plaintiff Neil Smith respectfully requests that the Court enter an order certifying the proposed Class pursuant to Rule 23(b)(3), appointing Michael J. McMorrow and Evan M. Meyers as Class Counsel, and awarding such additional relief as the Court deems reasonable and just.

Dated: October 7, 2013       Respectfully submitted,

                    By:   /s/ Michael J. McMorrow    
                    One of Plaintiff's Attorneys

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California   91403
Tel:  (818) 990-1299

Michael J. McMorrow (admitted *pro hac vice*)
mike@mjmcmorrow.com
MCMORROW LAW, P.C.
One North LaSalle St., 44th Floor
Chicago, IL 60604
Tel:  (312) 265-0708

Evan M. Meyers (admitted *pro hac vice*)
emeyers@mcgpc.com
MCGUIRE LAW, P.C.
161 North Clark Street, 47th Floor
Chicago, IL 60601
Tel: (312) 216-5179

*Counsel for Plaintiff NEIL SMITH*
*and the putative class*