David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Tel:  (818) 990-1299
Fax:  (818) 501-7852

Michael J. McMorrow (admitted *pro hac vice*)
mike@mjmcmorrow.com
MCMORROW LAW, P.C.
One North LaSalle St., 44th Floor
Chicago, IL 60604
Tel:  (312) 265-0708

*Counsel for Plaintiff NEIL SMITH
and the putative class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL SMITH, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>Defendant. | Case No. 11-cv-01958-JLS-BGS<br><br>CLASS ACTION<br><br>**PLAINTIFF NEIL SMITH'S RESPONSE IN OPPOSITION TO MICROSOFT'S MOTION TO STRIKE**<br><br>Judge: Hon. Janis L. Sammartino<br><br>Hearing Date: December 19, 2013<br>Time: 9:00 a.m.<br>Dept.:  4A |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................2

I.      The "New" Evidence Submitted By Plaintiff On Reply Was
        Both Contemplated By The Parties And Proper ...................................2

II.     Microsoft's Evidentiary Objections To The Supplemental
        Declaration Of Randall Snyder And The Declaration Of John
        Taylor Fail .........................................................................................8

        A.      Snyder's Experience and Qualifications Make Him a
                Particularly Reliable Expert for this Case...................................8

        B.      Legal Standard ...........................................................................9

        C.      Microsoft's Evidentiary Objections Relating to Class
                Ascertainability are Misplaced—the Class has Already
                Been Ascertained, and Any Contact Information Needed
                for Class Notice Purposes Can be Readily and Reliably
                Obtained. .................................................................................11

                1.      The names and contact information for the vast
                        majority of the cellular telephone numbers can be
                        obtained pursuant to subpoena. ......................................13

                2.      The carriers' data retention periods are not
                        impediments to obtaining any necessary Class
                        member contact information...........................................14

                3.      Snyder reliably demonstrates that third-party
                        providers can provide any necessary contact
                        information. ...................................................................15

        D.      Snyder's Testimony as to C&S's Opt-In Procedures is
                Reliable and Can Help the Court Assess the Legitimacy
                of the Consent Claimed by Microsoft in This Case.................16

1.      Snyder relies on Microsoft's own evidence to testify as to C&S's opt-in practices being typical in the industry. ...................................................16

2.      Snyder's testimony does not contain improper legal conclusions...........................................18

E.      Microsoft's Objections Relating to CompliancePoint's Methodology are Baseless and Ignore the Objective and Reliable Testimony Provided by Snyder and Taylor...............20

CONCLUSION ........................................................................................22

## TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*Abaxis, Inc. v. Cepheid*,
    No. 10-CV-02840-LHK, 2012 WL 2979019 (N.D. Cal. July 19, 2012) ..... 10-11

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
    215 F.3d 219 (2d Cir. 2000) ................................................................7

*Bernsten v. Dollar Tree Stores, Inc.*,
    CV 05-1964 MO, 2007 WL 756744 (D. Or. Mar. 6, 2007) ................................6

*Big 5 Sporting Goods Corp. v. Zurich Am. Ins. Co.*,
    --- F. Supp. 2d ----, No. 12-03699, 2013 WL 3526039 (C.D. Cal. July 10,
    2013) ....................................................................................7

*Campbell v. Pricewaterhouse Coopers, LLP*,
    CIV.S-06-2376, 2009 WL 594998 (E.D. Cal. Mar. 5, 2009) ..............................6

*CE Design Ltd. v. Cy's Crabhouse North, Inc.*,
    259 F.R.D 135 (N.D. Ill. 2009) ...........................................................12

*Connelly & Merritt v. Hilton Grand Vacations Co., LLC*,
    No. 12-cv-00599-JLS-KSC .................................................................8

*Darensburg v. Metro. Transp. Com'n*,
    No. C-05-01597-EDL, 2008 WL 4277656 (N.D. Cal. Sept. 15, 2008) .............18

*Daubert v. Merrill Dow Pharm., Inc.*,
    509 U.S. 579 (1993)................................................................... 9-10

*Docusign v. Seritifi, Inc.*,
    468 F. Supp. 2d 1305 (W.D. Wash. 2006) ..........................................5

*El Pollo Loco, Inc. v. Hashim*,
    316 F.3d 1032 (9th Cir. 2003) ...........................................................4

*Ellis v. Navarro*,
    No. C 07-5126 SBA PR, 2012 WL 3580284 (N.D. Cal. Aug. 17, 2012) .... 10-11

*Elsayed Mukhtar v. California St. Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002) amended sub nom. *Mukhtar v. California
   St. Univ., Hayward*, 319 F.3d 1073 (9th Cir. 2003) ............................................9

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
   823 F. Supp. 2d 995 (N.D. Cal. 2011) ...........................................9

*F.T.C. v. Neovi, Inc.*,
   No. 06-cv-1952-JLS(JMA), 2012 WL 28959987 (S.D. Cal. Jul 11, 2012) .......10

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
   No. 07 C 5953, 2009 WL 2581324 ...................................................12

*Getz v. Boeing Co.*,
   654 F.3d 852 (9th Cir. 2011) ..................................................4

*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 ...........................................................passim

*In re East Airport Dev., LLC*,
   443 B.R. 823 (B.A.P. 9th Cir. 2011) ...............................................4

*In re Nat'l W. Life Ins. Deferred Annuites Litig.*,
   268 F.R.D. 652 (S.D. Cal. 2010) ................................................ 11-12

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009).............................................10

*Johns v. Bayer Corp.*,
   No. 09-cv-1935-AJB(DHB), 2013 WL 1498965 (S.D. Cal. Apr. 10,
   2013) ......................................................................10

*Laconner Assoc. Ltd. Liab. Co. v. Island Tug & Barge Co.*,
   No. C07-175RSL, 2008 WL 2077948 (W.D. Wash. May 15, 2008).................10

*Lerwill v. Inflight Motion Pictures, Inc*,
   582 F.2d 507 (9th Cir. 1978) .......................................................11

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
   767 F. Supp. 1220 (S.D.N.Y. 1991) ...............................................7

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   C07-03952 JW (HRL), 2008 WL 2783206 (N.D. Cal. July 15, 2008)
   objections overruled, C 07-03952 JW, 2008 WL 3200822 (N.D. Cal.
   Aug. 7, 2008) ................................................................................6

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
   289 F.R.D. 674 (S.D. Fla. 2013)............................................... 8-9, 20

*New Grade Int'l Inc. v. Automatic Sprinkler Corp. of Am./Kiddie Fire
   Fighting (USA)*,
   205 F. App'x 571 (9th Cir. 2006) ........................................4

*Precision Seed Cleaners v. Country Mut. Ins. Co.*,
   No. 03:10-cv-01023-HZ, 2013 WL 943571 (D. Or. Mar. 11, 2013) ...............10

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ........................................4

*S.E.C. v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ....................................... 4-5

*Satterfield v. Simon & Schuster, Inc.*,
   569 F.3d 946 (9th Cir. 2009) .........................................17

*Scott v. Ross*,
   140 F.3d 1275 (9th Cir. 1998) ........................................9

*Thomas v. Newton Int'l Ent.*,
   42 F.3d 1266 (9th Cir. 1994) .........................................9

*Tovar v. U.S. Postal Svc.*,
   3 F.3d 1271 (9th Cir. 1993) ..........................................5

*Walsh v. Provident Mut. Life Ins. Co. of Philadelphia*,
   No. 98-10602, 1999 WL 511928 (C.D. Cal. Apr. 22, 1999)..............................7

**OTHER AUTHORITIES**

*Federal Judicial Center, Judges' Class Action Notice and Claims Process
   Checklist and Plain Language Guide* (2010) ....................................12

FED.R.CIV.P. 23 ...................................................................................... 10-11

FED.R.CIV.P. 23(c)(2) ...................................................................................12

FED. R. EVID. 702 ............................................................................ 9-11, 15

FED. R. EVID. 704 ....................................................................................18

# INTRODUCTION

Microsoft sent text message advertisements to 91,708 phone numbers that its agent, Come-n-Stay, Inc. ("C&S"), claimed were exclusively assigned to cellular telephones. They were not. In fact, over a third of the "cellular" numbers to which Microsoft blasted its text message spam were landline telephone numbers. C&S represented to Microsoft that the phone numbers on its list all validly "opted in" to receive text message advertisements, despite the fact that many of the numbers were not cellular telephone numbers and couldn't possibly receive text messages. Microsoft blindly accepted its agent's representations and sent the spam text messages that led to this lawsuit.

Microsoft now wants to use its agent's incompetence and its own acceptance as a defense to the lawsuit stemming from those acts. Microsoft used the three months it had to respond to Plaintiff's Motion for Class Certification to call as many numbers on the list as it could, and then hired an expert to opine that at least 24% of the "cellular" numbers it called were, in fact, landlines. After Microsoft was unable to obtain a single unequivocal statement from anyone that she consented to receive its text message, Microsoft turned to arguing that, because some of the phone numbers happened to be landlines, the Class could not be ascertained without calling each number individually.

That assertion was wrong. Responding to Microsoft's new evidence, Plaintiff and his expert engaged a vendor to determine which of the numbers to which Microsoft sent messages were landlines, and which were cellular phones. That vendor (CompliancePoint), using real-time data maintained by Neustar, Inc., the definitive source for information on wireless numbers and short codes, not only determined which of the numbers were cellular numbers on the date the text messages were sent, it also determined that 30,116 of those numbers were registered on the National Do Not Call Registry. CompliancePoint's review and

classification of the already-introduced evidence undermined the central argument in Microsoft's opposition – that the Class cannot be certified because every number would need to be called to determine if it was a cellular number on the date Microsoft sent the text messages – and demonstrated that the Class could be defined by reference to objective data.

Addressing CompliancePoint's analysis head-on would not help Microsoft; it understands that CompliancePoint gets its information from Neustar, and since Microsoft itself licenses several short codes[1] from Neustar, Microsoft also understands the veracity of its data.   Instead, Microsoft seeks to strike the declarations or, failing that, to undermine their foundations.

Microsoft's arguments against class certification fall in on themselves.   It asks the court to find that all 91,708 numbers to which it sent the text message consented to receive text messages (despite no evidence of such consent), but then it argues that the nearly 38,000 of those numbers which weren't cell phones makes the class unascertainable.   It never attempts to reconcile these contradictory facts. Instead, Microsoft attempts to bury these facts under the noise of its imprudent motion to strike.   For the reasons set forth below, the motion should be rejected.

## **ARGUMENT**

## I.    **The "New" Evidence Submitted By Plaintiff On Reply Was Both Contemplated By The Parties And Proper**

The Supplemental Declaration of Randall Snyder and the Declaration of John Taylor are proper and should be considered by the Court in resolving the pending Motion for Class Certification.   Both declarations respond narrowly to new evidence and arguments generated by Microsoft only after Plaintiff filed his

---

[1] Short Codes 43895, 46676, 83556, and 95483 are all licensed to Microsoft by Neustar.

Motion for Class Certification, and only first brought to the attention of Plaintiff at the moment that Defendant filed its opposition papers.

The "new" evidence[2] submitted by Plaintiff in his Reply directly and narrowly addresses the new evidence that Microsoft itself attached to its Opposition.  As the parties discussed in their Stipulated Motion for Extension (Dkt. 49), Microsoft's Opposition included "16 separate expert and non-expert declarations and over 40 exhibits, including a significant amount of new evidence that was not included in Plaintiff's Motion."  (Dkt. 49 at 2, ¶ 3.)  That Stipulated Motion itself contemplated Plaintiff filing new evidence on reply.  The Stipulated Motion stated that, in order to adequately respond to Defendant's Opposition, "Plaintiff will require additional time to conduct necessary fact investigation and, possibly, discovery … to address the assertions raised in the Opposition." (Dkt. 49 at 3, ¶ 7.)  The parties agreed that the proposed extension – for the express purpose of allowing time for additional fact investigation – would "not prejudice either party" (Dkt. 49 at 4, ¶ 8), and agreed to leave over a month between the filing of the Reply and the hearing (which the Court then extended by another month).

As an initial matter, Microsoft's argument that Plaintiff is prohibited from presenting additional evidence in his Reply brief to rebut new evidence presented by Microsoft in its Opposition, is wrong.  The rule in the Ninth Circuit is that:

> where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence **_without giving the [non-]movant an opportunity to respond_**.

---

[2] In fact, the evidence submitted by Plaintiff on Reply is hardly "new" evidence. It merely clarifies the same evidence already at issue – the list of "cellular" phone numbers provided by C&S to m-Qube – by removing the landline phone numbers from that list.

*Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (emphasis added). Microsoft attempts to rely upon the first portion of this rule while ignoring the second. Courts of this Circuit, including the Ninth Circuit itself, have repeatedly interpreted the law to allow the submission of new material on reply as long as the non-movant has an opportunity to address the new material. In *Provenz*, for example, the Ninth Circuit considered both the evidence presented on reply and the additional evidence later submitted by the non-movant. *See id.* In *Getz v. Boeing Co.*, 654 F.3d 852 (9th Cir. 2011), the Court found that the district court did not abuse its discretion in admitting a manual that was "submitted for the first time in [the defendant's] reply to the motion." 654 F.3d at 868. In another case, *In re East Airport Dev., LLC*, 443 B.R. 823, 829 (B.A.P. 9th Cir. 2011), the Ninth Circuit B.A.P. similarly rejected the exclusion of evidence filed on reply when the non-movant "was not surprised or prejudiced by" its introduction.

The Ninth Circuit has explicitly stated that "considering an issue first raised in [a movant's] reply brief" is not error when the non-movant "had an opportunity to respond." *New Grade Int'l Inc. v. Automatic Sprinkler Corp. of Am./Kiddie Fire Fighting (USA)*, 205 F. App'x 571, 572 (9th Cir. 2006) (collecting authorities). It is not an abuse of discretion to entertain entirely new arguments raised for the first time in a reply brief where the movant was responding to the nonmovant's argument, and "[d]enying [movant] the opportunity to counter [a] potentially dispositive argument would have effectively stripped [movant] of its right to argue against" a defense. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040 (9th Cir. 2003). Where the "district court listened to, considered, and rejected" a non-movant's contentions against new evidence, "no abuse of discretion occurred." *Id.* at 1041. And in *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010), the Ninth Circuit rejected the nonmovant's claim that it was error for the

district court to consider new evidence submitted with the plaintiff's reply brief on its summary judgment motion.[3]   In that case, the movant "had no reason to know that the issue would be contested until defendants first denied their admission in their memorandum in opposition."   617 F.3d at 1087 n.9.   These cases bear strongly on the case at bar.   The "new" evidence submitted by Plaintiff in his Reply was submitted only to respond to new argument raised by Microsoft in its own Opposition to the Motion for Class Certification.[4]   Further, Microsoft has had ample opportunity to respond to any such "new evidence," and will have additional opportunity to respond at the upcoming oral argument on Plaintiff's Motion for

---

[3] Microsoft's reliance on *Tovar v. U.S. Postal Svc.*, 3 F.3d 1271 (9th Cir. 1993), is unavailing.   In *Tovar*, the plaintiff-appellant attempted to present additional evidence in her reply brief on appeal, not on a contested motion in the trial court. *See* 3. F.3d at 1273 n.3.   *Docusign v. Seritifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006), is similarly inapposite.   In that case, the court refused to accept new evidence in a preliminary injunction motion where the supplemental declaration "references a host of new evidence and information" and provides "ten pages of new opinion," which collectively rendered the "scope of the new evidence … too extensive to remedy by merely allowing supplemental briefing." *Id.*

[4] Contrary to what Microsoft now argues (D's Mot. at 4-5), there was never any reason for Plaintiff to have suspected that landline numbers were sent the text message at issue, much less to have previously conducted any formal landline "scrub."   The transmission of text messages to landline phones defies logic, as landline phones could not receive the Xbox text message.   Further, at the time Plaintiff filed his Motion for Class Certification, Microsoft itself contended that the list in question contained only cellular phone numbers.   For example, Microsoft has produced documents, including emails and work orders from its agents, showing that this text campaign was part of a "*Mobile* Advertising Campaign," with the intent that the text messages would be targeted only to mobile devices.   (*See* Dkt. 34-3, Ex. 1) (emphasis added).   And Microsoft made no suggestion in the parties' November 14, 2012 Joint Discovery Plan submitted to Magistrate Skomal that C&S sent some messages to landline phones, nor did it make any such suggestion in its Answer (Dkt. 16) or in its responses to Plaintiff's Interrogatories.

---

Class Certification.  Microsoft <u>chose</u> to move to strike the declarations, rather than seek to take discovery or file a sur-reply.

Courts in this Circuit have repeatedly drawn a distinction between entirely new arguments/evidence on reply, and evidence/arguments submitted to respond to issues first raised by the nonmoving party in its response.  In the latter, courts generally accept any new evidence or argument and give the opposing party an opportunity to reply.  In *Bernsten v. Dollar Tree Stores, Inc.,* CV 05-1964 MO, 2007 WL 756744 (D. Or. Mar. 6, 2007), the court stated that exhibits and argument that "are merely responsive to issues [nonmovant] raised in her response" are not "new evidence" and may properly be considered.  2007 WL 756744, at *2.

In a situation similar to the one here, in *Campbell v. Pricewaterhouse Coopers, LLP*, CIV.S-06-2376 LKK-GGH, 2009 WL 594998 (E.D. Cal. Mar. 5, 2009), the court stated:

> a court may consider evidence submitted for the first time in a reply if the adverse party has had an opportunity to respond. This is true even when the moving party's additional evidence is "new" in that it goes beyond merely countering evidence submitted in opposition to the motion for summary judgment. The policy served by excluding new evidence is the avoidance of prejudice to the non-moving party. Here, where PwC has actually responded to the challenged evidence in the context of its cross-motion on the exact same issues, there is no prejudice. Absent prejudice, the court's preference for deciding cases on the merits warrants consideration of this evidence.

2009 WL 594998, at *1 (internal citations omitted).  See also *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, C07-03952 JW (HRL), 2008 WL 2783206, at *1 n.1  (N.D. Cal. July 15, 2008) *objections overruled,* C 07-03952 JW, 2008 WL 3200822 (N.D. Cal. Aug. 7, 2008) (accepting and considering facts and argument raised for first time on reply where "the challenged statements were properly raised in response to arguments that defendants made (apparently for the

first time) in their opposition" and "defendants had sufficient opportunity to respond to those arguments at the motion hearing.")

Furthermore, several courts of this Circuit have cited approvingly to *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), which held that "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party who took it upon himself to argue those previously unforeseen issues." *See Big 5 Sporting Goods Corp. v. Zurich Am. Ins. Co.*, --- F. Supp. 2d ---, No. 12-03699, 2013 WL 3526039, at *10 n.8 (C.D. Cal. July 10, 2013) (accepting new information on reply which responded to new theory raised in opposition papers); *Walsh v. Provident Mut. Life Ins. Co. of Philadelphia*, No. 98-10602, 1999 WL 511928, at *4 n.3 (C.D. Cal. Apr. 22, 1999) (finding that reply papers "properly address a matter raised in [] opposition brief").[5]

The courts of this Circuit are firm in finding that "new" evidence on reply is appropriate when it responds to arguments or evidence raised for the first time by the non-movant in its response. Where, as here, the evidence did not even exist until the Defendant created it <u>after</u> Plaintiff filed his class certification motion, the purpose of allowing additional evidence on reply becomes even more obvious. Rejecting Plaintiff's evidence would effectively prevent Smith or any movant from rebutting a defendant's argument in response to a motion. That is not the rule.

---

[5] See also *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000) (affirming district court's reliance on new reply argument because "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party") (citing *Litton Indus.*, 767 F. Supp. at 1235).

## II.  Microsoft's Evidentiary Objections To The Supplemental Declaration Of Randall Snyder And The Declaration Of John Taylor Fail

### A.  Snyder's Experience and Qualifications Make Him a Particularly Reliable Expert for this Case.

Randall Snyder's qualifications (set forth in detail in his initial and Supplemental Declarations) to analyze and opine on the text messages at issue here are evident.  He has nearly 30 years of experience in the telecommunications industry and has substantial hands-on experience in the fields of both landline and cellular telecommunications networking technology.  (Snyder Supp. Decl. ¶ 4.) Snyder has been retained as a testifying or consulting expert in over 60 cases regarding cellular telecommunications technology, including 40 cases regarding text messaging (SMS), and 32 cases regarding the TCPA and related regulations, including cases representing both plaintiffs and defendants, including before this Court.  (*Id.*; *see Connelly & Merritt v. Hilton Grand Vacations Co., LLC*, No. 12-cv-00599-JLS-KSC.)   Snyder has been at the forefront of the entire mobile marketing industry, not only as a technical consultant and retained expert witness, but also in forming and running companies that conduct the very types of text message marketing campaigns at issue in this case.  (Snyder Supp. Decl. ¶¶ 5-6.)

Instead of retaining its own expert to address Snyder's facts and opinions on the merits or taking his deposition to challenge those facts and opinions, Microsoft suggests that Snyder is not qualified to render his opinions and that his opinions and conclusions lack foundation and are unreliable.  Microsoft is wrong.

The use of a wireless "scrub," like the one done here by CompliancePoint and Snyder, has been held to support class certification in other similar cases including *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 n.3 (S.D. Fla. 2013), where Snyder similarly provided expert testimony as to the scrubbing of a list of phone numbers against a wireless number portability

directory to remove the landline phones and determine that more than half of those numbers were wireless phones.  The *Manno* court accepted Snyder's similar expert testimony and certified the class.  *Id.*

**B.     Legal Standard**

The standards of Fed. R. Evid. 702 apply broadly, permitting expert testimony on matters beyond the general knowledge of the finder of fact.  *Thomas v. Newton Int'l Ent.*, 42 F.3d 1266, 1269-70 n.3 (9th Cir. 1994); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998).  Though the Court must determine whether expert testimony is reliable, it has broad latitude on how to make such determination. *Elsayed Mukhtar v. California St. Univ., Hayward,* 299 F.3d 1053, 1064 (9th Cir. 2002) *amended sub nom. Mukhtar v. California St. Univ., Hayward*, 319 F.3d 1073 (9th Cir. 2003).  When, as here, the type of expert testimony is not "scientific" or otherwise highly technical, but rather is the "kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it," the court need not test it against the factors articulated in *Daubert v. Merrill Dow Pharm., Inc.* 509 U.S. 579, 592 (1993)— peer review, publication, and error rates.  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017-18 (citing *Mukhtar*, 299 F.3d at 1064) (finding expert testimony may be deemed reliable based on expert's knowledge and experience).

To assess the admissibility of expert evidence based primarily on the experience of the expert witness, a court looks to: (1) whether the expert opinion is based on scientific, technical, or other specialized knowledge; (2) whether the opinion would assist the trier of fact; (3) whether the expert has appropriate qualifications; (4) whether the expert's methodology fits the conclusions; and (5) whether the probative value of the testimony outweighs prejudice, confusion, or undue consumption of time."  *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 823 F. Supp. 2d 995, 1002 (N.D. Cal. 2011) (citing *United States v. Hankey*, 203 F.3d

1160, 1168 (9th Cir. 2000) ("in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally.")

Although the Court should engage in a rigorous analysis of the Rule 23 requirements and must ensure that expert evidence is reasonable and reliable, at the class certification stage Courts focus primarily on whether the expert evidence "is useful in evaluating whether class certification requirements have been met." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 616 (N.D. Cal. 2009). Any questions as to the factual basis of the expert's opinions, or methodology, accuracy, or degree of relevance, go to the weight given to the testimony—not its admissibility. *See Hangarter*, 373 F.3d at 1017 n.14; *see also Johns v. Bayer Corp.*, No. 09-cv-1935-AJB(DHB), 2013 WL 1498965, at *9 (S.D. Cal. Apr. 10, 2013); *Abaxis, Inc. v. Cepheid*, No. 10-CV-02840-LHK, 2012 WL 2979019, at *3 (N.D. Cal. July 19, 2012). When the court itself is the trier of fact, the court's gatekeeping role under *Daubert* is less "pressing." *See F.T.C. v. Neovi, Inc.*, No. 06-cv-1952-JLS(JMA), 2012 WL 28959987, at *6 (S.D. Cal. Jul 11, 2012); *Laconner Assoc. Ltd. Liab. Co. v. Island Tug & Barge Co.*, No. C07-175RSL, 2008 WL 2077948, at *1 (W.D. Wash. May 15, 2008) (citing *Volk v. United States*, 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999)).

Additionally, "[u]nlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," *Daubert*, 509 U.S. at 592 (citing Fed. R. Evid. 702, 703), so long as "the opinion is based on the expert's 'knowledge, skill, experience, training, or education.'" *Ellis v. Navarro*, No. C 07-5126 SBA PR, 2012 WL 3580284, at *6 (N.D. Cal. Aug. 17, 2012) (citing Fed. R. Evid. 702; *United States v. Romo*, 413 F.3d 1044, 1049 (9th Cir. 2005)); *Precision Seed Cleaners v. Country Mut. Ins. Co.*, No. 03:10-cv-01023-HZ, 2013 WL 943571, at

*15 (D. Or. Mar. 11, 2013) ("an expert may rely on his own experience in formulating his opinion, as long as the court finds it relevant and reliable.")  In fact, "Rule 702 imposes no requirement that experts have personal experience in an area to offer admissible testimony relating to that area."  *Abaxis*, 2012 WL 2979019, at *3 (citing *Daubert*, 509 U.S. at 592).  Moreover, an expert is allowed to rely on assumptions of underlying facts at issue because the trier of fact ultimately draws conclusions.  *See Ellis*, 2012 WL 3580284, at *6 (citing *United States v. Collins*, 78 F.3d 1021 (6th Cir. 1996)); *see also Hangarter*, 373 F.3d at 1017 n.14 ("the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.")

    **C.**    **Microsoft's Evidentiary Objections Relating to Class Ascertainability are Misplaced—the Class has Already Been Ascertained, and Any Contact Information Needed for Class Notice Purposes Can be Readily and Reliably Obtained.**

    Microsoft's first argument against the admissibility of Snyder's testimony is that it lacks foundation and reliability to ascertain or identify the proposed Class. (D's Mot. at 7-10.)  Microsoft's argument fails.  While the names and contact information of the Class members will eventually be necessary for providing notice to the Class, such information is not necessary at the class certification stage.

    As explained in Plaintiff's opening brief in support of class certification, Rule 23 requires that the class definition identify "a distinct group of plaintiffs whose members [can] be identified with particularity."  *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 659 (S.D. Cal. 2010) (citing *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir. 1978)).  The class definition must supply "objective criteria" by which membership may be "presently ascertain[ed]," such as "a defendant's own actions and the damages caused by such actions."  *In re Nat'l W. Life*, 268 F.R.D. at 659.  The wireless

telephone numbers to which Microsoft and its agents sent the Xbox text messages on September 12, 2008 are known, and themselves satisfy the ascertainability requirement, as courts regularly certify TCPA classes based on such lists of recipients.   *See, e.g., G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (finding TCPA class identifiable because "[plaintiff] may use the log and fax numbers to 'work backwards' to locate and identify the exact entities to whom the fax was sent."); *CE Design Ltd. v. Cy's Crabhouse North, Inc.* 259 F.R.D 135, 141 (N.D. Ill. 2009) (finding class sufficiently identifiable in a TCPA fax case through reference to fax numbers on transmission logs).  Because the m-Qube List will allow the parties to "determine who is and who is not in the classes based on [the] records," the class definition "adequately describe[s] the proposed class[]." *In re Nat'l W. Life*, 268 F.R.D. at 660.

The contact information that Microsoft asserts is necessary to ascertain the Class members is necessary only to provide the Class members with sufficient notice—*after* the Class is certified.  *See* Fed.R.Civ.P. 23(c)(2) (requiring *for any class certified* the "best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.)[6]

Microsoft's objections as to ascertainability are misplaced and irrelevant; the Class has been fully and objectively identified as those individuals who subscribed to the 55,123 cellular telephone numbers to which the September 12, 2008 text message was sent.  Nothing more is needed at the class certification stage.

---

[6] The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable and satisfies Due Process.  *Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), p. 3.

### 1. The names and contact information for the vast majority of the cellular telephone numbers can be obtained pursuant to subpoena.

Even if the names and contact information associated with each cellular number were relevant at the class certification stage, Snyder's Supplemental Declaration demonstrates that names and addresses for each of the 55,123 numbers are reliably available directly from the carriers, regardless of the data retention period of any particular carrier.

Microsoft argues that only four out of the eight primary carriers identified in Exhibit 2 to the Supplemental Declaration would still have retained the customer identifying data since 2008. (D's Mot. at 9.) This argument is a red herring. The overwhelming majority of numbers on the list provided by m-Qube in this case (approximately 75,000 of the 91,708 telephone numbers on the initial m-Qube List) were assigned to Cingular Wireless. (*See* Dkt. 34-3, Ex. 5.) Cingular is now part of AT&T Mobility, whose customer data is available, as shown in Exhibit 2 to the Supplemental Declaration.

Microsoft also tries to make an issue of the fact that "28 different carriers" are associated with the numbers on the m-Qube List, and that Snyder's failure to mention 20 of these carriers renders his testimony "unreliable." (D's Mot. at 9-10.) A simple review of the m-Qube data already produced in this case reveals that 19 of the carriers were associated with fewer than 20 numbers each, including 15 carriers who were associated with 3 or fewer numbers, and 13 who were each associated with only a single number. (*See* Dkt. 34-3, Ex. 5.)

Cingular, on the other hand, was associated with about 75,000 numbers, and Snyder accounted for this information by providing the data retention policies for AT&T. There was thus no need for Snyder to discuss which carriers had which numbers because all but about 60 of the 91,708 numbers on the m-Qube List came

from six carriers—AT&T/Cingular, Boost Mobile, Sprint/Nextel, T-Mobile, U.S. Cellular, Verizon, and Virgin.   There was no need for Snyder to discuss the retention period for every carrier, and his decision not to include those specific details in his Supplemental Declaration does not detract from the reliability of his analysis or the validity of his conclusions.

   2.   The carriers' data retention periods are not impediments to obtaining any necessary Class member contact information.

   Microsoft's argument about the data retention policies for the carriers is also misleading.   As Snyder testifies, customer-identifying data is available even from carriers who no longer retain certain data as a matter of course, and also from third-party vendors.   Snyder explains that "for those carriers that do not maintain subscriber data as far back as September, 2008, those carriers can still determine and provide the subscriber data records for subscribers that used a particular cellular telephone number within the data retention period that still had that cellular telephone number as far back as September 2008."   (Snyder Supp. Decl. ¶ 30.)   Thus, if an individual were a wireless customer at any time within a given carrier's data retention period, then that carrier would have a record of when that individual's subscription with the carrier started.   The carrier would know how long the customer had that number with that carrier and, thus, whether the individual was a customer as of or before September 2008.[7]   Thus, every cellular telephone to which the Xbox text message was sent has been identified, the

---

[7] For example, if an individual were a Verizon customer now or at any time within the past five years (Verizon's data retention period), then Verizon would currently possess data revealing when that individual started as a customer with Verizon with that same telephone number.   If Verizon knows that an individual was a customer with the same number continuously both before and after September 2008, then Verizon can verify that the individual was a Verizon customer as of September 2008 and provide the customer's contact information.

---

wireless carrier affiliated with each such message has been identified, and as amply demonstrated by Snyder's testimony, just a handful of subpoenas would reveal the names and contact information associated with nearly all proposed Class members.

### 3. Snyder reliably demonstrates that third-party providers can provide any necessary contact information.

Even if it turns out that a few Class members cannot be identified through carrier records (which is doubtful), those Class members can still be identified through other means.  Snyder explains that "there exist commercially available third-party information service companies that collect and maintain subscriber data on behalf of the wireless carriers.  These companies maintain comprehensive and extensive databases that identify subscribers based solely on their cellular telephone numbers and maintain this data over several years."  (Snyder Supp. Decl. ¶ 34.)   Snyder even provides two (out of many) specific examples, Neustar Information Services and A.B. Data, Ltd.  (*Id*.)

Microsoft does not attempt to explain if or why Snyder is incorrect, or why these companies would not be able to perform such a common "reverse lookup" service.  Nonetheless, Microsoft objects that Snyder "provides no evidence these companies maintain subscriber information, text message records, bill copies, and payment history on behalf of the carriers.  Nor does [Snyder] provide any evidence of the methods these companies employed, their accuracy rates, or reliability." (D's Mot. at 10-11.)  As discussed above, none of this information is necessary for ascertaining the Class.  Moreover, Microsoft's argument as to whether these companies retain text message records, bill copies, and payment history is completely irrelevant, even for purposes of providing notice to the Class.  Further, Fed. R. Evid. 702 does not require Snyder to have identified the methods or

accuracy rates of these third-party service providers.[8]   One such information provider identified by Snyder is Neustar Information Services.   (Snyder Supp. Decl., ¶ 34.)   As Snyder explained, Neustar is the telecommunications database gold standard, operating and maintaining the highly reliable and popular database of all telephone numbers in the country.  (Snyder Supp. Decl. ¶ 12-13.)

**D.   Snyder's Testimony as to C&S's Opt-In Procedures is Reliable and Can Help the Court Assess the Legitimacy of the Consent Claimed by Microsoft in This Case.**

Microsoft seeks to strike Snyder's testimony regarding C&S's opt-in procedures (D's Mot. at 11), because Snyder provides the only objective statement regarding C&S's opt-in procedures.  Microsoft has not sought to question Snyder about this testimony, nor has Microsoft put forward its own witnesses to disagree with it or to provide another opinion as to the legitimacy of C&S's opt-in procedures.  Unable to explain how a text campaign from a valid "opt-in" database could result in tens of thousands of text messages sent to landline numbers, and no individuals who can testify that they actually consented to receive the text, Microsoft instead attacks the messenger.  Microsoft's objections fail.

**1.   Snyder relies on Microsoft's own evidence to testify as to C&S's opt-in practices being typical in the industry.**

Microsoft states that there is no basis for Snyder's "conclusion that C&S participated in 2008 in what Snyder believes is an improper, yet 'typical' industry practice, other than his own subjective belief."  (D's Mot. at 11.)  But Snyder's conclusion is drawn from the evidence that Microsoft itself put forth to show "consent."  Snyder does not dispute that C&S had a practice of putting together

---

[8]   Such a requirement would be akin to requiring an expert to identify Dun & Bradstreet's methods and accuracy rates when opining that D&B has a service that provides business records.

and then selling access to a database of individuals who had sought free ringtones, horoscopes and other mobile content.   To the contrary, he acknowledges Microsoft's evidence describing C&S's "opt-in" practices.  (Snyder Supp. Decl. ¶ 22.)  Snyder merely states that C&S's opt-in practices – which Microsoft proclaims serve as evidence of consent – were "typical" in the industry (Snyder Supp. Decl. ¶ 21), and that the Ninth Circuit discussed the legitimacy of such similar opt-in practices in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009), a case in which Mr. Snyder also served as an expert witness.

Snyder is significantly qualified to testify about the typical opt-in practices in the mobile marketing industry.  He has been repeatedly found qualified to testify about the very topics at issue in this case, and he has unparalleled experience in this industry, and has worked in the industry since its inception. *See Hangarter*, 373 F.3d at 1017-18.

Microsoft also takes issue with Snyder "ignoring" the "evidence of consent" proffered by Microsoft.   The problem with this objection, however, is that Microsoft doesn't offer any evidence of consent.   Microsoft has only offered hearsay statements that C&S's subscribers signed up to receive ringtones, horoscopes or other mobile content – none of it from Microsoft – in exchange for agreeing to receive future text messages from C&S or the company that provided the content.  Even if this is true (which is doubtful), it is not evidence that any C&S "subscriber" consented to receive any text message *from Microsoft* or any text message related to Xbox.   Microsoft never addresses this point, and offers no evidence that any recipient of the relevant Xbox text message actually consented to receive that text message or any other text message from Microsoft.[9]   Microsoft

---

[9] None of Microsoft's purported "evidence of consent" – including C&S's own website, the warranty that C&S offered m-Qube, and trade articles about C&S –

even contacted approximately 1,300 recipients of the text message and none of them said that he or she actually consented to receive that message.

### 2.     Snyder's testimony does not contain improper legal conclusions.

Contrary to Microsoft's objections, Snyder is not offering an improper legal conclusion as to consent.  (D's Mot. at 12-13.)   Although Snyder's testimony provides strong evidence that the text recipients never consented to receive the Xbox text message, Snyder does not affirmatively conclude that the text recipients did not validly consent under the TCPA.[10]  Rather, he explains that C&S's opt-in procedures were typical in the industry at that time but were in clear violation of the Mobile Marketing Association's ("MMA") Consumer Best Practices and Guidelines.  (Snyder Supp. Decl. ¶¶ 23-24.)   This is not an improper legal conclusion, as even Microsoft concedes that the MMA Guidelines are not legal authority.  (D's Mot. at 12 n.12.)   Rather, Snyder explains that the MMA Guidelines provide a common sense manner by which to have consumers opt-in to receive text messages and that, based on his experience, opt-in practices like the

---

constitutes actual evidence of any consent here.   C&S's employees may self-servingly claim that what other C&S employees did was legitimate, but none of that "evidence" shows consent to receive text messages from Microsoft.

[10] Even if Snyder's testimony as to the reliability of C&S's opt-in practices is an opinion on an "ultimate issue," such an opinion is still permissible under Fed. R. Evid. 704, which permits an expert witness to opine on an "ultimate issue."  *See Hangarter*, 373 F.3d at 1016-17*; see also Darensburg v. Metro. Transp. Com'n*, No. C-05-01597-EDL, 2008 WL 4277656, at *2 (N.D. Cal. Sept. 15, 2008). Further, Snyder's reference to the TCPA, FCC regulations, and the *Satterfield* decision (a case in which he was an expert witness whose testimony was specifically referenced by the Ninth Circuit) is also not improper, as "an expert may refer to the law in expressing an opinion without crossing the line into a legal conclusion."  *Darensburg*, 2008 WL 4277656, at *2.

ones employed by C&S make no sense and would not provide a reliable basis by which to obtain valid consent.  (Snyder Supp. Decl. ¶¶ 23-24, 36.)

As Snyder explains, the MMA Guidelines state that an individual's consent to receive text messages pertains "only to the specific program the consumer has subscribed to and should not be used to promote other programs, products, or services, or to otherwise send information of any kind that is unrelated to that specific program] unless the subscriber has opted in to receive this information." (Snyder Supp. Decl. ¶¶ 23-24; Ex. 1.)  There is no evidence that the Xbox text message was related to any ringtone or horoscope, or to the unknown entity that provided such content.  Microsoft has made no suggestion – and submitted no evidence – that any of C&S's subscribers ever opted-in to receive text messages *from Microsoft*. Microsoft simply cannot deny that C&S's opt-in procedures, as explained by C&S to Microsoft, ran afoul of the MMA Guidelines.[11]

As Snyder explains, C&S's opt-in practices were contrary to the MMA Guidelines—it would defy common sense for an individual's singular "opt-in" in exchange for free mobile content to constitute consent to receive any and all future text messages from *other* sources.  (Snyder Supp. Decl. ¶ 24.)  If C&S's practices were legitimate, then a cell phone user, in exchange for a single ringtone, could have his or her telephone number "sold, resold and passed around to any company wishing to contact that subscriber for any reason at any time."  (*Id*.)  This would also render any approval process after an initial "opt-in" completely extraneous. (*Id*.)  The fact that Snyder's testimony will lead this Court to the only reasonable

---

[11] Microsoft suggests that Snyder ignored the "lack of complaints C&S received" and "the miniscule number of recipients who opted out of receiving more text messages."  (D's Mot. at 12.)  This incorrectly assumes that text messages comply with the TCPA unless someone complains about them.  The absence of complaints is not evidence of consent.

conclusion – that the Class members did not consent to receive the text message – does not mean that his testimony is itself an improper legal conclusion.

### E.   Microsoft's Objections Relating to CompliancePoint's Methodology are Baseless and Ignore the Objective and Reliable Testimony Provided by Snyder and Taylor.

Microsoft's final objection relates to Snyder's statements about CompliancePoint, the entity that identified which numbers on the m-Qube List were actually cellular phone numbers as of September 12, 2008. Microsoft does not take issue with CompliancePoint's practices, the data results produced by CompliancePoint showing that 55,123 numbers on the m-Qube List were cellular numbers as of September 12, 2008, or the testimony of John Taylor stating that the data relied upon by CompliancePoint "provides the most accurate wireless status" of the numbers in question. (Dkt. 60-2, ¶ 8.)[12]  Rather, Microsoft suggests that Snyder offers no foundation for his conclusion that CompliancePoint's analysis of the data is trustworthy. (D's Mot. at 13-15.)  But Snyder both defines the databases relied upon by CompliancePoint (Snyder Supp. Decl. ¶ 17), and also explains in detail what they are and why they are reliable. (*Id*. ¶¶ 10-17.)

For example, Snyder explains FCC-mandated telephone number "portability" (Snyder Supp. Decl. ¶¶ 10-11) and the fact that all numbers are "connected to a real-time telephone number database" "owned, operated and maintained by … Neustar, Inc." (*Id*. ¶ 12.)  Snyder further explains that this centralized "real-time number database" operated by Neustar is of extreme importance in the telecommunications industry, and that the Neustar database is

---

[12]  As set forth in § II.A, above, a wireless "scrub" very similar to the one conducted by CompliancePoint here, and Snyder's testimony relating thereto, was very recently accepted by the Southern District of Florida and provided the basis for class certification in a TCPA case there.  *See Manno*, 289 F.R.D. at 684, n.3.

considered in the industry to be highly reliable and "by far the most authoritative and popular database serving the carriers." (*Id.* ¶¶ 12-13.)

Microsoft does not dispute the reliability of the Neustar database from which CompliancePoint's data was culled.  Taylor states that CompliancePoint's data is pulled directly from the Direct Marketing Association Wireless Block List, which as explained by Snyder "is simply the naming convention for Neustar's cellular telephone number database containing numbers that have always been cellular telephone numbers and is derived from Neustar's larger wireless and cellular telephone number database." (*Id.* ¶ 17.)   Taylor further states that CompliancePoint's data is also pulled from the Neustar Wireless Portability List, which Snyder explains is "a list of telephone numbers that had been ported from a landline telephone number to a cellular telephone number at least 31 days prior to September 12, 2008.  (*Id.*)   In short, the sources and reliability of CompliancePoint's data are explained in detail and cannot reasonably be disputed.[13]   Consequently, there is ample foundation for Snyder's reliable conclusion that "Defendant called the 55,123 cellular telephone numbers on September 12, 2008." (Snyder Supp. Decl. ¶ 36.)  All objections to the contrary should be overruled.

---

[13] Microsoft also complains that "[n]either Snyder nor Taylor explains which, if any, of the numbers on the Do Not Call Registry were cell phones in September 2008." (D's Mot. at 14.)  This baseless objection stems from a misreading of the CompliancePoint data and the Taylor affidavit.  While CompliancePoint provides the Do Not Call Registry data as part of its service, that data has nothing to do with whether the numbers on the m-Qube List were landline or cellular numbers as of September 12, 2008.  While the Registry data further belies any argument that C&S's database was legitimate or that the Class members consented to receive the text message, this data has nothing to do with the accuracy of the identification culled from the other databases, and has no impact on any conclusions reached by CompliancePoint or Snyder.

## **CONCLUSION**

For the reasons discussed above, Plaintiff Neil Smith respectfully requests that the Court deny Defendant Microsoft Corporation's Motion to Strike in its entirety, and award such additional relief as the Court deems reasonable and just.

Dated: November 27, 2013                    Respectfully submitted,

                                       By:   /s/  Michael J. McMorrow
                                       One of Plaintiff's Attorneys

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California   91403
Tel:  (818) 990-1299
Fax: (818) 501-7852

Michael J. McMorrow (admitted *pro hac vice*)
mike@mjmcmorrow.com
MCMORROW LAW, P.C.
One North LaSalle St., 44th Floor
Chicago, IL 60604
Tel:  (312) 265-0708

Evan M. Meyers (admitted *pro hac vice*)
emeyers@mcgpc.com
McGUIRE LAW, P.C.
161 N. Clark Street, 47th Floor
Chicago, IL 60601
Tel: (312) 216-5179
Fax: 312-275-7895

*Counsel for Plaintiff NEIL SMITH*
*and the putative class*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on November 27, 2013, I caused the foregoing *Plaintiff Neil Smith's Response in Opposition to Microsoft's Motion to Strike* to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party:

THOMAS W. MCNAMARA (SBN 127280)
mcnamarat@ballardspahr.com
CHRYSTA L. ELLIOTT (SBN 253298)
elliottc@ballardspahr.com
BALLARD SPAHR LLP
655 West Broadway, Suite 1600
San Diego, California 92101-8494
Tel: (619) 696-9200
Fax: (619) 696-9269

CHARLES B. CASPER (*pro hac vice*)
ccasper@mmwr.com
JENNIFER E. CANFIELD (*pro hac vice*)
jcanfield@mmwr.com
MONTGOMERY McCRACKEN
WALKER & RHOADS, LLP
123 South Broad Street, 24th Floor
Philadelphia, Pennsylvania 19109
Tel: (215) 772-1500
Fax: (215) 772-7620


/s/  Michael J. McMorrow